Janet A. HARTMAN, Plaintiff,

v.

The CITY OF PROVIDENCE, et al., Defendants.

Civ. A. No. 85–0154–S.

United States District Court, D. Rhode Island.

June 5, 1986.

Tillinghast, Collins & Graham, Steven E. Snow, Douglas A. Giron, Providence, R.I., for plaintiff.

Coia & LePore, George L. Santopietro, Providence, R.I., for defendant Cook.

Palombo & Piccirilli, Vincent J. Piccirilli, Joseph Sciacca, Providence, R.I., for defendant Cianci.

DeSimone & Leach, Herbert F. DeSimone, Jr., Providence, R.I., for defendant DeSimone.

Edward C. Clifton, City Sol., Faith A. LaSalle, Asst. City Sol., Anthony A. Giannini, Jr., Deputy Asst. City Sol., Providence, R.I., for all other defendants.

## OPINION AND ORDER

SELYA, District Judge.

Janet A. Hartman, the plaintiff herein, brought this suit in early 1985 against a variety of municipal defendants, viz., the city of Providence (City) and its Board of Park Commissioners (Board); Vincent A. Cianci, Jr., former mayor of Providence and quondam chairman of the Board; Bruce F. Melucci and Leila Mahoney, who were aides to Cianci during parts of the period in question;[1] Frank A. Merlino, the City's personnel director; Joseph R. Paolino, Jr., whose variegated roles are described in the margin;[2] Kay Owen, Sally DeSimone, Carmine A. Bucci, Beatrice Carter-Blackwell and Max E. Meller, all of whom were members of the Board during the times material hereto; and Merrick A. Cook, Jr., one-time superintendent (Superintendent) of the City's parks department (Department). All of the individual defendants, save only Paolino (*see ante* n. 2), were

1. Mahoney, an executive aide to Mayor Cianci from early 1983 forward, served inter alia as the mayor's liaison to the City's parks department and to the Board. Melucci, during the period, leapfrogged between positions as a special assistant to the mayor (during which times he was a municipal employee) and as a political manager. In the latter posts, he was not employed by the City but by divers political committees pledged to enhance Cianci's electoral well-being.

2. Paolino, who was dropped as a defendant shortly before the commencement of trial, has worn many hats. The most pertinent of his millinery adornments was his service as president of the Providence City Council (Council) from January 1983 until April 1984, during which interval he acted as a member of the Board at the behest of the Council. Thereafter, Paolino succeeded Cianci as acting mayor, *see post,* and became the new chairman of the Board. Paolino was subsequently elected as mayor in his own right in August 1984 to fill the unexpired portion of Cianci's term, and he continues so to serve.

sued in both their official and individual capacities. The defendant DeSimone counterclaimed. But, inasmuch as these counterclaims were voluntarily dismissed by her during the trial, Fed.R.Civ.P. 41(a)(2), they need not be discussed in any detail. The court's jurisdiction is premised on the presence of federal questions, 28 U.S.C. § 1331, although pendent state law claims have also been asserted.

The case was tried to the court on seven different days from March 24, 1986 to April 14, 1986. On the fifth day of trial, after the plaintiff had rested, the court dismissed the plaintiff's state law tort claim for intentional infliction of emotional distress as unproven. *See* Fed.R.Civ.P. 41(b). Certain claims for punitive damages were stricken at the same time. *Id.* Following posttrial briefing, oral arguments were heard on May 6, 1986. Decision was reserved. This rescript comprises the court's findings of fact and conclusions of law. Fed.R.Civ.P. 52(a).

## I.

The origins of this suit date back to a failed marriage between the defendant Cianci and James W. Diamond. Cianci was first elected to the Providence mayoralty as a Republican in November of 1974; Democrats had held that office continuously since 1940, and Cianci's triumph marked the start of a new era in Providence politics. Approximately midway through his first term, Cianci appointed Diamond as Superintendent of the Department. Diamond took office on March 9, 1976.

The relationship between the two men was a vicissitudinary one; at times they were close allies, at other times they were at sword's point. As months and years marched on, the relationship became increasingly stormy. Cianci attempted on at least one occasion to remove Diamond from office, but the Superintendent was reinstated after a court battle.[3]

In late 1981, Diamond decided to reorganize the Department. In the course of this reshuffling, several new positions were created. One of these was the position of executive assistant to the Superintendent. There was no job description for this post and no search was conducted to fill it. Instead, Diamond tapped the plaintiff as his personal choice for the slot. Hartman had been active in Democratic politics and had worked for another municipal parks department, but she had never before worked for the City. (In point of fact, she was not a Providence resident.) The plaintiff was not hired for a fixed term.

Hartman's duties under Diamond's regime were never precisely defined. Diamond testified that she had been hired in order to "free my time to deal with more profitable things." He viewed Hartman as a "key" employee. She managed the Superintendent's office, took responsibility for many personnel matters, played a role in labor/management relations, handled certain fiscal and administrative chores, coordinated the work of the division chiefs, and performed a potpourri of other assignments. Although she retreated from the phrase at trial, the plaintiff described herself retrospectively in her curriculum vitae as the Department's "second in command;" that description was not technically accurate, but it was true as a practical matter. In any event, Hartman certainly served, in her own words, as Diamond's "adviser" and "liaison," and as a "conduit" en route to and from the Superintendent. Diamond was entirely satisfied with the plaintiff's performance.

The cauldron began to bubble in November of 1982. Cianci was reelected to his third term as mayor (this time, running as an Independent). At the same election, Providence voters adopted a new Home Rule Charter (Charter) which materially altered the contours of municipal government. The parties agree that, shortly after the election, Cianci convened a meeting of his most trusted counsellors at a posh New-

---

**3.** A succinct summary of Diamond's struggle to retain his suzerainty over the Providence parks during the period 1979–1983 has been set forth by the First Circuit, *see Diamond v. Bucci,* 732 F.2d 17, 18 (1st Cir.1984). The interested reader is referred to Judge Breyer's opinion for background material in this regard.

port resort. The plaintiff insinuates that it was at this session that the plot to rid city government of Diamond and those loyal to him was hatched. The court credits Melucci's version of this confabulation: there was consideration of whether Diamond should be reappointed as Superintendent, and the consensus of the cadre did not favor his retention. There was absolutely no discussion of any purge of Diamond loyalists.

The Charter took effect in January 1983. Among its coterie of significant provisions, it refashioned the Board and vested in the Board supervisory authority over the City's public parklands and over the Department. *Id.* at § 1003. The Board, by law, was to comprise seven members: the mayor ex officio, four mayoral appointees, and two members "elected by the city council." *Id.* Cianci nominated the defendants Owen, DeSimone, Meller, and Carter-Blackwell. In addition, Paolino and Bucci sat as commissioners by designation of the Council. Of this array, only Bucci had previously been a member of the predecessor Board. Despite the fact that these appointments were generated within the political process, they were not frankly political in the pejorative sense. Owen, DeSimone, and Meller all testified in this case; all were public-spirited citizens who possessed excellent qualifications for service on the Board. All were truthful witnesses. And, the court has no reason to believe that Bucci (a former chairman of the Board in its previous incarnation) or Carter-Blackwell (who has since moved out of state) were of a different ilk.

At its organization meeting, the Board chose Cianci as its chair, Owen as vice-chair, and Carter-Blackwell as secretary. The mayor, apparently cognizant of competing demands upon his time, designated Mahoney as his emissary to the Board and the Department. *See ante* n. 1. Although Mahoney regularly attended meetings (even when Cianci was present) and served as a member of the Board's budget subcommittee, she had no vote at Board meetings either as Cianci's designee or in her own right.

Soon after taking office, the newly-constituted Board, as it was permitted to do under the freshly minted Charter (*see Diamond v. Bucci, supra*), declared the Superintendent's office to be vacant. Diamond was retained betimes as acting superintendent and a search to find a Superintendent was begun. Not surprisingly, Diamond was among the aspirants. During this interim period, Hartman continued to act as Diamond's executive assistant, and her role in the affairs of the Department was, for the moment, essentially unchanged.

While the search was ongoing, several other things occurred. Two are of particular note. The first was the emergence of a budding sense of insecurity within the Department. Fearing wholesale personnel changes, Hartman and several others undertook in early 1983 to organize a "defense fund" for park employees. (The evidence on this point was meagre; it is unclear how successful the effort was, and there is no credible proof that any defendant knew about it.) This apprehension manifested itself in another way as well: one of Hartman's fellow workers, Diane Marchetti, spearheaded an attempt to unionize certain supervisory employees of the Department. The court finds that the plaintiff played a minor role in this endeavor; that no defendant identified her in any prominent way with the plan; and that, in any event, the unionization initiative (which ultimately failed) was not a matter of any especial concern to the Board.

The second set of developments was of far greater overall importance. Cianci had run afoul of the law in the wake of a domestic imbroglio, and was eventually indicted. Diamond, who had become one of the mayor's most vocal critics, spoke out publicly against him on numerous occasions. Hartman accompanied Diamond on some of these excursions, although her role was essentially a passive and unobtrusive one. In June 1983, the plaintiff attended a (supposedly) secret meeting in Boston to begin to design a campaign to recall the mayor. The cabal did not remain hidden for long; there was credible evidence that Cianci's staff knew about the pow-wow within a matter of hours. There was nothing to show, however, that plaintiff's at-

tendance at the meeting was revealed. In the aftermath of this session, a loosely-organized committee to foster recall began to take shape. The plaintiff, although undoubtedly in sympathy with the movement, was neither a leader of it nor otherwise publicly identified with it.

The pot came to a veritable boil in the fall of 1983. The defendant Cook emerged as the survivor of the Board's search. On October 14, 1983, Cook was appointed as Superintendent and Diamond was simultaneously dismissed. Cook was a long-time municipal employee who had toiled in the City's vineyards for upwards of two decades as a planner and urban development specialist. He was a newcomer to the Department. Although registered as a Democrat, Cook was essentially apolitical. That is not to say that he was neutral on the subject of recall: Cianci was widely—and accurately, in the court's view—perceived as Cook's patron, and, as might be expected of any incumbent department head in such circumstances, Cook favored retention of the mayor.

Not coincidentally, Diamond's removal galvanized the pro-recall group into more prolific action. A formal structure began to emerge. Diamond was generally regarded as the movement's guru and leading light. The plaintiff's involvement, if any, was *sub rosa*.[4] Opposition to recall solidified as well. A group known as the Committee Against the Recall Effort (CARE) was formed. The defendant Melucci became its spokesman and executive director. Some of the other defendants, *e.g.*, Owen, were members of CARE, and a clear majority of the park commissioners supported Cianci's desire to stay in office.

Nominally, Hartman's position was unaffected by Cook's ascendancy. She remained in the executive assistant berth. Early on, Cook had Hartman brief him on her duties, and at first, her regimen was little altered. Cook credited the plaintiff with familiarizing him with the overall operation. Gradually, however, Cook personally assumed some of the plaintiff's former duties (*e.g.*, he bypassed his aide and took direct responsibility for coordination among the division chiefs) and abolished others as unnecessary (*e.g.*, he reversed Diamond's earlier directive that Hartman routinely attend all Board meetings).[5] Eventually, in or about February 1984, Cook determined that the executive assistant's post, given Hartman's shrunken duties and the Department's budgetary crunch, should be scrapped.

A digression is perhaps in order at this point. Certain fiscal realities are starkly apparent on this record. The Department had a substantial deficit, reliably estimated to be in excess of $400,000, for the then-current fiscal year. Mayor Cianci, beset with myriad problems of his own, had admonished department directors whose fiefdoms were operating at a loss to balance their budgets. The adoption of the Charter had aggravated the historic fiscal woes of the Parks Department by classifying additional pieces of property as "parklands" and assigning to the Department responsibility for upkeep (without any concomitant increase in funding). Federal subsidies were on the wane.

The newly-appointed Board gave the deficit priority attention from and after the time of its organizational meeting in 1983

4. The plaintiff harps on the fact that Cook, within a few days after taking office, saw Diamond and the plaintiff in each other's company at a local restaurant one evening. Such raillery is, in the court's view, much ado about nothing. The court attaches no importance to the chance meeting.

5. Hartman, while Diamond's second in command, had developed an intricate system for tracking absenteeism, sick leave, overtime, and the like within the Department. Thereafter, she monitored compliance. Cook thought that the rigamarole was counterproductive, and eviscer-

ated it. This decision caused one of the plaintiff's most time-consuming responsibilities to evaporate into thin air. She was not asked to involve herself in the less convoluted alternate which Cook preferred. The parties have repeatedly tried to drag the court into the maelstrom of whether the Hartman-designed system was good or bad, but the court refuses to swim in those troubled waters. The merits of Hartman's plan are not at issue here. Just as Diamond was entitled to handle such matters as he deemed best during his tenure, Cook had a perfect right to adopt a different (simpler) approach.

and formed a budget subcommittee largely to address that problem. Cook, in this same spirit, not only reviewed personnel reallocations as a possible method of effecting savings, but took other steps as well. For example, he surveyed the Department's insurance program, scrutinized purchasing procedures, and curtailed the personal use of departmental motor vehicles. All of these actions were undertaken in the hope of reducing expenditures. Although the plaintiff has labored long and hard in these proceedings to brand the supposed budgetary crisis as a manufactured and self-serving pretext, those efforts will not wash. As the 1984–85 fiscal year approached, the Department was under considerable economic pressure.

Having determined that the executive assistant's post was unneeded, Cook presented his recommendation in this regard to the Board's budget subcommittee at a meeting held on March 22, 1984. At the same session, he also requested that certain other jobs be erased [6] and that some assignments be realigned within the Department. The budget subcommittee accepted these recommendations in their totality. Later that day, the full Board, acting on the favorable report of the subcommittee, abolished all four of the positions in question. Cook was then dispatched to break the unhappy news to the plaintiff. He did so that same day, spelling out the rationale for the decision.

Hartman asked Cook for clarification of certain aspects of the Board's action, *e.g.,*

when her job would be phased out, what would happen to her accrued leave time, etc. Those inquiries were answered adequately and in a timely fashion, both orally and in writing.[7] But, Hartman never requested that she be granted a hearing with respect to the reorganization or her consequent loss of employment. Despite the long lead time between notice of the Board's action and her final pay period, she did not in any way suggest to Cook, any member of the Board, or any other City official that she had been given insufficient information as to the reasons underlying the adverse personnel action. She voiced no desire to confront the Board.

The plaintiff was separated from the Department's service in early May of 1984. Her departure was accomplished under circumstances which were not stigmatizing in any way. What little remained of her duties was spread among the existing departmental staff. Cianci resigned as mayor in April 1984 and Paolino became acting mayor (and was thereafter elected by the voters in his own right to fill the unexpired portion of the four year term to which Cianci had been elected in November 1982). Cook continued as Superintendent until late 1985, and did so without the benefit of an executive assistant or comparable aide.[8] And, this litigation ensued.

## II.

As originally presented in this suit, the plaintiff's complaint implicated three dis-

---

**6.** Four positions (including Hartman's) were eliminated at this time. Two of them had been funded in the 1983–84 budget, but were vacant in March 1984. A third (project manager for environmental services) was manned, but the current occupant was able to slide back to his former design services job within the Department. Thus, the plaintiff was the only employee who was severed from the payroll entirely as a result of this reorganization.

**7.** There was considerable fuss at the trial concerning one of these writings, Exhibit 17. That document, which professed to be a letter to the plaintiff from the City's personnel director, Merlino, was typed on Melucci's stationery. (Melucci, at the time, had been returned to the municipal payroll as a special assistant to the

mayor.) Melucci denied any involvement in Hartman's loss of her job, disclaimed any foreknowledge of Exhibit 17, and inferentially ascribed the use of his stationery to a clerical bevue. The court credits this testimony. Merlino authored the letter, and he did so without any direction or input from Melucci.

**8.** At a significantly later date, the position of fiscal/personnel chief was created within the Department, but the court attaches no significance to that development. The responsibilities of that office were appreciably different than those essayed by the Superintendent's executive assistant. More recently, Cook's successor (Nancy Derrig) hired a deputy superintendent, but that far-removed event is absolutely bereft of any consequence in terms of this case.

tinct sets of theories. Her flagship initiative was the contention that her position vanished in retaliation for the exercise of rights and privileges secured to her under the first amendment to the federal Constitution. Secondly, she claimed that this municipal action also violated her guaranty of due process as embodied by the fourteenth amendment to the Constitution. Thirdly, her complaint raised pendent state law claims. The court will analyze the first two arguments seriatim. The last amalgam of contentions need not be addressed. The court has already rejected the assertion that the defendants intentionally inflicted emotional harm upon the plaintiff. *See ante* at 1396–97. As to the balance of the state law counts, Hartman's counsel eschewed posttrial briefing thereon and conceded at oral argument that the asservations were bootless. The remaining state law claims are therefore foreclosed. *Healey v. Bendick,* 628 F.Supp. 681, 686 n. 5 (D.R.I.1986) (theories which are neither briefed nor argued, though originally advanced, are waived); *A & H Manufacturing Co., Inc. v. Contempo Card Co., Inc.,* 576 F.Supp. 894, 896 n. 1 (D.R.I.1983) (same).

## A. *First Amendment Rights*

As a public employee, the plaintiff may establish this aspect of her case by showing that the defendants' (unfavorable) decisions regarding her continued employment resulted from her engagement in constitutionally sacrosanct activities. *Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 283–84, 97 S.Ct. 568, 574, 50 L.Ed.2d 471 (1977); *Smith v. Harris,* 560 F.Supp. 677, 692 (D.R.I.1983). It is settled beyond peradventure of doubt that, as a

general rule, a municipality cannot condition governmental employment upon a basis which infringes the employee's constitutionally protected interest in freedom of expression. *Connick v. Myers,* 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983); *Pickering v. Board of Education,* 391 U.S. 563, 572–73, 88 S.Ct. 1731, 1736–37, 20 L.Ed.2d 811 (1968). Though there is no unwavering bright-line rule which pertains to all speech of all public employees in all circumstances, *e.g., id.* at 568–73, 88 S.Ct. at 1734–37 (the nature of the speech, the appropriateness of the forum, the disruptive effect upon coworkers, the actual or potential impact both upon the employment relationship and upon the efficiency of the public service, may all be taken into account); *Smith,* 560 F.Supp. at 692 (same), it is unnecessary to split hairs in this instance. The court assumes arguendo that Hartman's association with Diamond and her support for the recall campaign were entitled to plenary constitutional protection, *see Branti v. Finkel,* 445 U.S. 507, 515, 100 S.Ct. 1287, 1293, 63 L.Ed.2d 574 (1980); *Elrod v. Burns,* 427 U.S. 347, 355–60, 96 S.Ct. 2673, 2681–83, 49 L.Ed.2d 547 (1976); *Smith,* 560 F.Supp. at 694,[9] and that her union organizational activities and defense fund work were similarly so shielded. *See Brown v. Alexander,* 718 F.2d 1417, 1422 (6th Cir.1983).

At the *Mt. Healthy* threshold, it is the plaintiff who carries the devoir of persuasion in order to "demonstrate that [her] conduct was constitutionally protected *and* that it was a 'substantial' or 'motivating' factor in [her] dismissal." *Landry v. Farmer,* 564 F.Supp. 598, 605–06 (D.R.I. 1983) (emphasis added). Only if such a

---

**9.** The defendants argue heatedly that Hartman's job was confidential in character and involved significant policymaking. They contend, accordingly, that an expectation that she be politically and philsophically in tune with the Superintendent and the City's administration—an expectation which the defendants deny that they held or imposed on Hartman—would, in these circumstances, have been "an appropriate requirement for the effective performance of the public office involved." *Branti,* 445 U.S. at 518, 100 S.Ct. at 1295. The lines of demarcation in this mottled area of the law are uncertain, *see*

*DeAbadia v. Mora,* 792 F.2d 1187, 1194, (1st Cir.1986) (Campbell, C.J., concurring) ("Although the law seems clear at either end of the *Elrod-Branti* spectrum, not enough precedent dealing with various upper-level government positions in the middle of the spectrum has yet emerged to enable one to easily classify such a position."), and this case presents a close question in that regard. But, inasmuch as the court finds an absence of any proof of retaliatory animus, *see* text *post,* it is not necessary to venture into this Serbonian Bog.

showing occurs does the burden shift to the employer to prove that it would have reached essentially the same decision without regard to constitutionally impermissible factors. *Id.* at 606. Accordingly, Hartman's initial burden in this case is twofold. And, although the court has treated her extracurricular conduct as constitutionally protected, it remains to be seen whether she has demonstrated that such behavior played any significant role in the decision to abolish her job.

Though questions of motive are rarely subject to precise proof, the circumstances of this case are rather clear. This record, fairly viewed, does not sustain a plausible inference that Hartman's organizational and/or political activities, separately or in the ensemble, played the slightest part in her severance from the City's service. Inasmuch as proof of a negative is a painstakingly fact-intensive enterprise, the court will abjure a lengthy recital of the numerous findings which conduce to this conclusion in favor of a broader summarization of the key elements germane to the point.

1. The plaintiff's description of her involvement in union activities was vastly overblown. (Hartman herself, a generally unimpressive witness, exhibited a tendency toward exaggeration on this score; and Diamond, hardly neutral, was likewise disposed to gild this particular lily.) The credible evidence indicated that the plaintiff's participation in the attempt to unionize was minimal. She was not in any sense a sparkplug of the effort, nor was she one of its leaders. Although the court does not doubt that Hartman was in sympathy with the drive, she was an essentially silent and invisible ally of those (like Diane Marchetti) who stood at the forefront. From the defendants' coign of vantage, Hartman was simply one of the multitude of potential union members—more sheep than shepherdess. As Mahoney accurately recounted, the perception among municipal officials

was that the thrust toward unionization comprised "everyone in the whole division," that is, all 26 persons holding positions covered by the certification petition. The court finds that none of the respondents had any reason to associate the plaintiff to any especial degree with the organizational move. Indeed, all of those defendants who testified professed ignorance of any singular role undertaken by Hartman in respect to this project, and the court credits those disclaimers.

2. The flip side of the unionization coin was that the attempt generated no animadversion. It was not shown to have been a matter of notable concern to the mayor's office or to the Board. It failed abysmally. Moreover, Cook (whom Hartman struggled to portray as the primary instrument of her bedevilment) was not Superintendent in the mid-1983 time frame when this issue was on the front burner. Indeed, he was not then associated with the Department in any way. Despite the plaintiff's effort to balloon this topic out of all meaningful proportion, the court finds that the union organizational drive was a routine matter, that the defendants uniformly regarded it as small potatoes, that they harbored no generic hostility or ill will toward the leadership of the drive, and that they did not identify Hartman with the effort in any particularized sense.[10]

3. The campaign to recall Mayor Cianci was cut from a different bolt of cloth. That movement generated much controversy. Emotions ran high. The stakes were substantial. Considerable acrimony developed on both sides. And, the plaintiff undoubtedly danced in the recall chorus to some (minor) extent. Yet once again, her involvement was not especially significant. Hartman was not a part of the recall leadership, her sympathy with the movement was never publicized by the media (which covered the attempt to depose Cianci exten-

---

**10.** No special mention need be made of Hartman's work anent the legal defense fund. The plaintiff had the burden of going forward, but she offered only the sketchiest of generalities on this aspect of her case. The fund predated Cook; the defendants were not shown to have

known of it, or to have had any reason to link Hartman with it. And, in a mainstream which frothed at the slightest provocation (or sometimes, with no provocation at all), the fund caused nary a ripple.

sively), she did not collect signatures on recall petitions. To the extent that she was active in the campaign at all, her role peaked during the period when Diamond was still acting as Superintendent. She did very little in this regard once Cook's tenure began.

4. The plaintiff's association with, and allegiance to, Diamond was a subset of the recall allegations. Certainly, her fondness for the man who hired her was not open to question. Yet, the inference is unmistakable that the great majority of the middle echelon managers (the so-called senior staff employees) of the Department were loyal to Diamond and sympathetic to his quest to remain as Superintendent. Many of these senior staffers apparently favored Mayor Cianci's ouster. There was nothing of any consequence to distinguish Hartman from the pack.

5. What is most critical on these points is not whether the defendants would have disliked—and possibly disfavored—Hartman because of her politicking in respect to recall; it is whether the defendants knew of her work to undermine the mayor. Meller, a political independent and an articulate, forthright witness, testified unequivocally that he did not know whether or not Hartman had been active in the recall effort. In fact, he was totally unaware of her political leanings. Owen, a Republican and a woman of considerable attainment and stature in her own right, knew Hartman only in terms of departmental matters; she (credibly) professed complete ignorance of the plaintiff's position (or the lack of one) vis-a-vis recall. DeSimone's testimony mirrored Owen's in this wise. She, too, was convincing. These witnesses also testified that the Board, as a group, never discussed Hartman's politics or her allegiance to Diamond. The court is satisfied that these commissioners testified truthfully: the Board was not aware of, much less goaded into action by, Hartman's exercise of her first amendment rights.

6. That same lack of awareness permeated other levels of City officialdom as well.[11] Mahoney disclaimed all knowledge of the plaintiff's political activities; she had no conversations with either the Board or the mayor relative to that subject. Melucci, who candidly admitted that an exit visa for Diamond had been discussed by Cianci and his political advisers following the 1982 elections, denied that these discussions extended to Diamond's staff. (Although Melucci "had heard Hartman's name" and may have met her once, he had no knowledge as to whether she had taken up the cudgels in the recall campaign.) Cianci testified that he had no dealings with Hartman personally and was unaware of any anti-Cianci activity on her part. He flatly denied having urged the Board (or anyone else) to take action directed specifically at her[12] or to wage a pogrom against myrmidons of Diamond generally. On balance, these disavowals are worthy of belief.

7. Without question, in the winter of 1983–84 the City had become embattled; it was a house divided against itself. Yet, even if the portents were such that some of the defendants might have assumed or inferred that Hartman, as a Diamond protege, must have favored the incumbent mayor's enforced abdication, such sentiments were scarcely unique, in or out of government, at the time. To pile atop such an illation the further inference that the plaintiff, alone out of the multitude of pro-recallers, was cashiered for this reason requires a paralogical leap of Olympic proportions.

**11.** Even though Charles Mansolillo, the mayor's chief of staff, was aware of the exploratory meeting in Boston in June 1983, *see ante* Part I, the record does not suggest that Hartman's attendance at that session had been revealed. Even if her presence had been made known, little could be made of it. After all, John Campanini, director of the Department's ground maintenance division, who also attended that meeting, thrived under Cook's regime and suf-fered no adverse effects referable to his visit to Boston.

**12.** The plaintiff makes much of a December, 1984 "admission" supposedly made by Cianci at a local restaurant. The conflicting accounts of that vignette are somewhat garbled. But, even if the episode occurred substantially as stated by the plaintiff's niece, the remarks attributed to Cianci are probative of little except a consummate lack of grace.

The rough fabric of vendetta cannot be woven inferentially from such gossamer threads—not even in the hurly-burly of Providence politics.

8. Cook, too, seemed to be essentially uninterested in the plaintiff's flirtation with the recall campaign. He testified that he was not privy to any resentment on the mayor's part toward the *staff* of the Department (although he—and everyone else—knew of the ongoing dispute between Cianci and Diamond); that neither the mayor nor his aides had intimated that Cook should jettison particular employees; that he had no special insight into any unusual involvement on Hartman's part in the recall movement; and that, in any event, his only concern would have been if she had used City time for political ends. He knew of no such instance. Although Cook, in the court's view, was probably aware that the plaintiff was at least loosely affiliated with the recall camp, the court finds that this noesis did not affect his attitude or actions vis-a-vis Hartman in any significant way.

9. The plaintiff's heavy reliance on Paolino's assessment of the situation is misplaced. Paolino's testimony was adduced by deposition (Exhibit 29). To be sure, Paolino voted to retain the executive assistance slot. But, as Cianci's putative (interim) successor under the Charter, Paolino had the most to gain by embarrassing the administration. As he frankly acknowledged, *e.g.*, Ex. 29 at 17, 35, 44, in those stormy days he reflexively voted against anything that Cianci or Cook proposed. Paolino's spontaneous characterization of the Board's exorcism of the executive assistant post as "political retribution" was shown, upon examination, to be bereft of any adequate factual predicate. In his deposition, Paolino himself admitted that his use of such hyperbole was "political" rather than factual. *Id.* at 18. (Indeed, this must have been the case, for Cianci re-

signed and Paolino became mayor before Hartman left the City payroll, yet he took no steps to reverse the erasing of her position. *Id.* at 39.) Contrary to the plaintiff's thesis, Paolino's testimony effectively bolstered the defense case; for example, despite his evident interest in the machinations of recall and his service on the Board, Paolino had no awareness of any political involvement on Hartman's part. *Id.* at 8–9.

■ Facts such as these lead inexorably to the conclusion that Hartman's union and/or political activities did not contribute to the elimination of her position. Such a finding is fortified by the knowledge that other senior staffers who (i) were in favor of unionization, (ii) got along well with Diamond, and (iii) sympathized with the palace revolution, *e.g.*, Campanini, *see ante* n. 11, were not victimized by political reprisals.[13] Given the relatively minimal nature and extent of the plaintiff's protected conduct, it beggars credulity that she, above all others, would have been singled out for retaliatory treatment.

The final piece in the puzzle—the piece which, as the court sees it, proves beyond any question that the plaintiff's exercise of her first amendment rights was in no way causally related to the loss of her employment—is the strength of the defendants' proffered explanation of their actions. To be sure, the defense has no burden to produce *any* explanation unless and until the proponent of a reprisal firing claim makes out a prima facie case. *Clark v. Library of Congress*, 750 F.2d 89, 101 (D.C.Cir. 1984); *Barnes v. Bosley*, 745 F.2d 501, 507 (8th Cir.1984), *cert. denied*, — U.S. —, 105 S.Ct. 2022, 85 L.Ed.2d 303 (1985). And, Hartman has failed to surmount that obstacle. Nevertheless, where (as here) the defendants elect to present evidence of their reasons for the adverse personnel action despite the possible failure of the

---

13. The plaintiff cites Marchetti's discharge in March 1984 as evidence to the contrary. Marchetti was in the vanguard of the unionization effort, although her involvement (if any) in the recall campaign was nebulous. The defense presented an explicit recital of the (entirely unexceptionable) circumstances leading to Mar-

chetti's well-warranted termination for insubordination. That version of the event was never effectively rebutted and the court accepts it without reservation. Marchetti's situation, therefore, had no precedential value for Hartman's case.

plaintiff to limn a colorable prima facie showing, the court may consider that evidence in determining whether or not the plaintiff has scaled her initial hurdle. *Cf. Kephart v. Institute of Gas Technology,* 630 F.2d 1217, 1219–20 (7th Cir.1980) (per curiam) (ADEA); *Hosemann v. Technical Materials, Inc.,* 554 F.Supp. 659, 665 & n. 13 (D.R.I.1982) (Title VII).

It is crystal clear that the number of administrators in the Department proliferated during Diamond's tenure. The payroll escalated correspondingly. Especially after the advent of the Charter and the concomitant shifting of additional parklands to the Department's control, *see ante,* the Department was hip-deep in red ink. Cook was under great pressure to effectuate cutbacks in the operating budget. As Paolino testified, it was widely debated whether the Department legitimately "needed the amount of people that [Diamond] had on staff." Ex. 29 at 7.

The Board, in early 1983, formed its budget subcommittee with precisely these concerns in mind. From that time forward, there was an ongoing reappraisal of the justification for so topheavy a senior staff. Meller described the continuing review of management positions as "very important" given the Board's budgetary worries. Virtually every other well-informed witness concurred in this assessment. The court finds that, in 1983–84, the deficit was, in DeSimone's phrase, a "tremendous concern" of the Board. And, as Paolino noted, this concern was widespread. *Id.* at 20–21. It focused, naturally enough, on high administrative costs and fat in the payroll.

These misgivings cultivated the soil, rendering it receptive to future rollbacks. And, the seeds for the elimination of the executive assistant slot were sown when the search committee turned to Cook. Whereas Diamond's superintendency had been marked by an expansionist "develop-

mental" philosophy, Cook saw the chief goals of the Department in terms of maintenance. Even the plaintiff admitted as much. It matters little for the purpose at hand which philosophy was more conducive to "better" government: what is important is that Cook's approach was conceived by him as being in the best interests of the Department and of the City, and was not the product of some sort of sinister desire to launch a preemptive strike aimed at Diamond's retinue. As the First Circuit noted in the 29 U.S.C. §§ 621–634 (ADEA) context, "[w]hile an employer's judgment or course of action may seem poor or erroneous to outsiders, the relevant question is simply whether the given reason was a pretext for discrimination." *Loeb v. Textron, Inc.* 600 F.2d 1003, 1012 n. 6 (1st Cir.1979). In this case, it was not.

This change of direction had a discernible impact which was manifested in a variety of ways. To take another leaf from Meller's chronicle, he noted that the Board believed that total white-collar salaries comprised a disproportionate share of the overall departmental budget, and that cuts were indicated to free up funds for grounds maintenance. That philosophical change, combined with Cook's preference for the sort of "hands-on" management style which Diamond disdained, rendered the executive assistant's position eminently dispensable. Taken in the context of the times, Cook's assertion that the job had become unnecessary and should be eliminated for budgetary reasons bore a ring of authenticity.[14]

In summary, the court finds that the plaintiff methodically overstated the extent of her participation in protected organizational and political activities. The court further finds that the conduct in which she actually engaged, though constitutionally sheltered, was largely unknown to the majority of the defendants; in any event, that

---

**14.** The plaintiff argues that the explanation was bogus because eliminating her position saved relatively few current-year dollars. Such an asservation is disingenuous at best. Deleting any single surplus job in a large governmental budget can always, if taken in a vacuum, be made to look like a drop in the bucket. Yet, swollen public payrolls are necessarily pared on an item-by-item basis; unless a start is made, the goal of fiscal prudence will remain forever unobtainable. In budgetary matters as elsewhere on the road of life, "a journey of a thousand miles must begin with a single step." *The Way of Lao-Tzu* 64 (Wing-Tsit Chan translation).

behavior was not of the sort which was likely to spark (or which did spark) the official animosity to which she now lays claim. The court further finds that the actual decisionmakers—Cook and the Board—acted in Hartman's case entirely without reference to her sympathies for unionization and for recall and her political support for Diamond. They did so uninfluenced by pressure from City Hall, save only for a generalized and completely permissible directive to get the Department's fiscal house in order.

The executive assistant position was eliminated for generally praiseworthy reasons. It had become vestigial, given Cook's management style. The Board, searching for ways to clot the financial hemorrhaging which was bleeding the Department dry, saw abolition of the line item as a small step in the direction of economy.[15] The defendants acted on this belief. They were fully entitled to do so.

The plaintiff has not proven that her engagement in protected conduct was a substantial or motivating factor in the demise of the executive assistant position. Such conduct was, as the court appraises the mise-en-scene, no factor at all. Hartman has wholly failed to make out a prima facie case of retaliation directed against the exercise of her first amendment rights.

### B. *Procedural Due Process*

Hartman next asserts what may be characterized as a procedural due process claim: that she was deprived of a property interest without due process of law. That contention demands close and detailed attention in the circumstances at bar.

The Supreme Court has held repeatedly that "property" under the fourteenth amendment includes government benefits such as public employment. *See, e.g., Bishop v. Wood*, 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976); *Board of Regents v. Roth*, 408 U.S. 564, 576–78,

92 S.Ct. 2701, 2708–10, 33 L.Ed.2d 684 (1972). But, the concept of "property" does not arise from an employee's hope or expectation of continued employment, without more:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must have a legitimate claim of entitlement to it.

*Id.* at 577, 92 S.Ct. at 2709.

The source of any such "legitimate claim of entitlement" must be found principally in state law:

> [Property interests] are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*Id.* See also *Cleveland Board of Education v. Loudermill*, —— U.S. ——, 105 S.Ct. 1487, 1491, 53 L.Ed.2d 494 (1985); *Paul v. Davis*, 424 U.S. 693, 709, 96 S.Ct. 1155, 1164, 47 L.Ed.2d 405 (1976).

In this case, the plaintiff maintains that the Charter granted her just such a protected property interest in the executive assistant position. Specifically, Hartman relies on section 904 of the Charter, which intones:

> All department heads and all boards, agencies and commissions of the city shall have the responsibility for the appointment, promotion, demotion, suspension and dismissal of all employees under their jurisdiction in accordance with the provisions of this Charter and such personnel rules and regulations as may be made pursuant thereto. Regular employees shall not be dismissed except for cause which shall be defined in rules developed by the director of personnel and shall be promulgated to all employees of the city.

---

**15.** Hartman suggests that this decision was unwise; she claims that the position was a necessary one, and that it was false economy to prune it. But, that is not the point. The court is persuaded that Cook and the Board acted exclusively out of budgetary concerns. That being so, it is not for the federal judiciary to second-guess the sagacity of policy choices made by the executive branch of municipal government.

Hartman argues that she was a "regular employee" (a term which is not further defined in the Charter); that she could therefore only be fired "for cause;" and that this synergism created precisely the sort of protectible entitlement to the benefits of government employment which the Court has required to catalyze the due process clause. (She derives this claim directly from the Charter provision quoted above, as the "rules" of which § 904 speaks had not been formulated in 1984.)

If all of this is so, then Hartman deserved the usual prophylaxis before she was stripped of her job: a timely explanation of the charges or reasons, a predeprivation hearing or other meaningful opportunity to respond, and an evenhanded determination of the sufficiency of the "evidence." *Loudermill*, 105 S.Ct. at 1495–96; *Brasslett v. Cota*, 761 F.2d 827, 836–37 (1st Cir.1985). In short, if state law ceded to her a fourteenth amendment property interest in continued employment, then she could be deprived of it only in accordance with federal due process standards. *See Loudermill*, 105 S.Ct. at 1491–93; *Roth*, 408 U.S. at 577–78, 92 S.Ct. at 2709–10; *Perry v. Sindermann*, 408 U.S. 593, 600–03, 92 S.Ct. 2694, 2699–2700, 33 L.Ed.2d 570 (1972).

This analysis leads, in turn, to the capstone of the plaintiff's jeremiad: that she did not receive the full panoply of these protections. She urges, in point of fact, that she received none of them. And, while the court disagrees with that sweeping indictment of the Board's actions—the court, after all, has found that the specification of reasons was both adequate and seasonably given,[16] *see ante* at 1400, and

that the Board's decision to eliminate the position was factually supportable, *e.g.*, *ante* at 1404–05 & nn. 13–14—it is plain that she received no hearing. (The irony, of course, is that Hartman, who was more familiar with the applicable departmental personnel policies than was Cook or any member of the Board, requested none; and this, despite the long lead time between notice that her position would be abolished and her actual departure from the payroll.) And in Hartman's view, the absence of such a hearing, coupled with the admitted failure to notify her in so many words that she could be heard, was tantamount to an abridgment of due process. *E.g.*, *Memphis Light, Gas & Water Division v. Craft*, 436 U.S. 1, 15, 98 S.Ct. 1554, 1563, 56 L.Ed.2d 30 (1978); *Mullane v. Central Hanover Bank and Trust Company*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950).

The plaintiff's thesis, however, misses the central point. Even if the court was to assume that Hartman fell squarely within the encincture of § 904, it would avail her little in this instance; the wingspan of the disputed Charter provision does not reach this set of facts.

The court acknowledges at the outset that Hartman seems to have been a "regular employee." There is nothing in the record to suggest otherwise; she was not hired on a temporary basis, or in a probationary status, or for a fixed term, or under any idiocratic conditions of employment. The plaintiff's job was not in any of the categories of exempt positions enumerated by § 905 of the Charter. The defendants' argument that she was really a "deputy department head," and thus an "officer" of the City, *see* Charter § 1207, who was (arguably) at risk under § 1402,[17] is

---

**16.** The Supreme Court has unequivocally stated that either oral or written notice of the reasons for an adverse personnel action will suffice to satisfy procedural due process concerns, so long as the notification is both timely and informative. *Loudermill*, 105 S.Ct. at 1495; *Goss v. Lopez*, 419 U.S. 565, 581, 95 S.Ct. 729, 740, 42 L.Ed.2d 725 (1975).

**17.** Section 1402 of the Charter states in pertinent part that:

officers of the city . . . who are holding office on the effective date of this Charter, shall continue to serve in their respective offices until the expiration of their terms, or until they shall have been removed from office pursuant to the terms of this Charter applicable to their respective offices, or until their offices shall have been abolished. . . .

It was this Charter provision which was (lawfully) employed as the basis for Diamond's removal as Superintendent. *See Diamond v. Bucci*, 732 F.2d at 18–20.

puerile: whatever Hartman's functions might have been under Diamond's reign, she certainly did not serve as a deputy department head under Cook. Hartman was never appointed as the deputy superintendent, never paid as such, and ultimately, never terminated as such. As frosting on the cake, it may also be noted that the Board never purported to abolish the deputy superintendent's post on March 22, 1984; in fact, that job was later filled by another person. *See ante* n. 8. The plaintiff possessed all of the attributes of regularity vis-a-vis her City service. And, as this court has remarked before: if a creature walks like a duck and squawks like a duck, the odds are great that it is of the family Anatidae. *Cf. Healey*, 628 F.Supp. at 698 & n. 11; *Carroll v. Capalbo*, 563 F.Supp. 1053, 1058 (D.R.I.1983). Hartman must therefore be treated, for Charter purposes, as a regular employee.

Under § 904, regular employees "shall not be dismissed except for cause." The First Circuit has stated:

> A public employee has a constitutionally protected interest in continued employment where he has a reasonable expectation arising out of state statute, rules or the contract, that he will continue to be employed. Thus, ordinarily, one who can be removed only for 'cause' has a constitutionally protected 'property' interest, while one whose job is 'at will' does not.

*Perkins v. Board of Directors of School Administrative District No. 13*, 686 F.2d 49, 51 (1st Cir.1982) (citations omitted). *See also Ventetuolo v. Burke*, 596 F.2d 476, 481 (1st Cir.1979), *aff'g* 470 F.Supp. 887, 891 (D.R.I.1978); *Joslyn v. Kinch*, 613 F.Supp. 1168, 1178 (D.R.I.1985); *Landry*, 564 F.Supp. at 608; *Providence Teachers Union v. Donilon*, 492 F.Supp. 709, 711 (D.R.I.1980). Clearly, "whether or not [plaintiff's] interest in her job rises to the level of constitutionally protected 'property' depends upon whether the [defendants] could dismiss her only for 'cause'—an issue of state law." *Perkins*, 686 F.2d at 52 (citations omitted). Thus, the critical inquiry is whether Rhode Island law, and specifically § 904 of the Charter, created the sort of constitutionally protected property interest which extended to the circumstances at bar. *See Bishop*, 426 U.S. 341, 344–45, 96 S.Ct. 2074, 2077–78; *Local 2855, AFGE (AFL–CIO) v. United States*, 602 F.2d 574, 584 (3d Cir.1979) ("Whatever property interest the members of a class may have, its substantive dimensions are defined by the law that created it.").

■ The fatal flaw in Hartman's argument is that § 904, which delimits her supposed property interest in her employment, did not grant her a legitimate claim of entitlement to the executive assistant position in perpetuity; at best, it gave her a property interest in the job so long as the job existed. Nothing contained in § 904 or elsewhere in the Charter precludes City officials from taking measures to reduce budget deficits or from reorganizing the municipality's departments.

Inasmuch as state law circumscribes the dimensions of any constitutionally-protected property interest, the court must look first to the plain and ordinary meaning of the provision that "employees shall not be *dismissed* except for cause" (emphasis added) to determine whether the defendants deprived Hartman of property without due process of law. "In determining the scope of the statute, we look first to its language." *United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981). As the Court long ago opined:

> [W]here the words of a law ... have a plain and obvious meaning, all construction, in hostility with such meaning, is excluded. This is a maxim of law, and a dictate of common sense; for were a different rule to be admitted, no man, however cautious and intelligent, could safely estimate the extent of his engagements, or rest upon his own understanding of law, until a judicial construction ... had been obtained.

*Green v. Biddle*, 21 U.S. (8 Wheat.) 1, 89–90, 5 L.Ed. 547 (1823). This court's reiteration of the principle is likewise relevant to the task at hand:

> When the language of a statute, ordinance, or rule is clear and unambiguous,

courts must not interpose their own notions of the underlying intent.... Where the call of the framers is muted or uncertain, judges must interpret, and in interpreting, judges must often create. But where ... the call is clear and undistorted, the effort to rewrite a statute or rule under the guise of judicial interpretation invades territory forbidden to the courts.

*Odence v. Salmonson Ventures,* 108 F.R.D. 163, 170 (D.R.I.1985).

■ The operative word "dismiss" can only be understood to encompass those situations where a worker's employment is terminated, but the employment itself remains available. *Cf.* R.I.Gen.Laws § 36–4–8 (governing "dismissal" of classified employees in state service); *id.* at § 36–4–7 (treating "layoffs" arising out of "material change in duties or organization, or shortage or stoppage of work or funds" as distinct from "dismissal"). It connotes an action predicated upon some personal attribute of the employee (say, poor work habits or dishonesty) rather than an action bottomed upon an employer's good faith wish to eliminate a position which has itself become unneeded, unaffordable, or otherwise undesirable. Such an understanding comports with the accepted dictionary definition of "dismiss": "to put out of office or service by an act of authority: usually implying disgrace." *Funk & Wagnall's New Standard Dictionary of The English Language* (I. Funk ed. 1934). Moreover, the accepted legal definition of the word partakes of the same connotations, viz., "to send away; to discharge; to discontinue; to dispose of; to cause to be removed temporarily or permanently; to relieve from duty." H. Black, *Black's Law Dictionary* (5th ed. 1979).

These characterizations also fit neatly within the integument and context of § 904; the other personnel actions covered by this section of the Charter ("appointment, promotion, demotion, suspension") relate to the individual's suitability and job performance, not to the more basic question of the appropriateness of the position itself. Further, giving the word such a lexical meaning tracks the personnel policy of the City as expressed elsewhere in the Charter. *E.g., id.* at § 902(d) (Providence's personnel management system shall rest, inter alia, on the principle of "[r]etaining employees on the basis of the adequacy of their performance, correcting inadequate performance, and separating employees whose inadequate performance cannot be corrected"). The suggested definition likewise conforms with the distinction made elsewhere in the Charter between an employee being "removed" and his or her office "hav[ing] been abolished." *See* Charter § 1402 (quoted *ante* n. 17). Lastly, such a construction of § 904 comports with common sense as well. This Court will not lightly read into the Charter language which would freeze the City's payroll in place without regard to the legitimate needs of municipal governance. This court reaffirms what was said in *Audet v. Board of Regents for Elementary and Secondary Education,* 606 F.Supp. 423, 431 (D.R.I.1986):

The Constitution protects the basic liberties of the citizenry: it safeguards the rights of both the employer and the employee. It cannot be construed as a wellspring of tenure for every employee, in every circumstance, or as a guarantee that a worker may keep his job, irrespective of his employer's needs or wishes, merely because he prefers to do so.

Statutes, ordinances, and personnel regulations of the genre typified by § 904 of the Charter can most sensibly be construed to apply to adverse personnel actions directed against a particular employee because of his or her behavior, deportment, performance, qualifications, or the like, while leaving unaffected actions which are in good faith directed at positions rather than individuals. Even though government, by eliminating or reshaping an outmoded job, may indirectly cause the loss of a person's employment, such policy determinations are not the stuff of which civil service or comparable merit systems are fashioned. Indeed, the government qua employer acts essentially in an administrative capacity in deciding how elaborately agencies should be staffed and where

scarce personnel dollars can most usefully be devoted. To the contrary, when government gauges the adequacy of a particular civil servant's job performance, or the person's suitability for continued employment, the sovereign acts essentially in a quasi-judicial capacity—a role that meshes more naturally with the procedural due process safeguards which laws or rules like § 904 contemplate.

This distinction—which preserves to government the right flexibly to address systemic needs while preserving to the employee meaningful protection against job actions directed specifically against him or her—seems consistent with the weight of authority and with the Rhode Island cases. Numerous federal and state courts have recognized that an employee who loses his or her job or who is furloughed is not entitled to a hearing, despite the presence of a "no dismissal except for cause" rule, when the position is abolished pursuant to a bona fide government reorganization or kindred cost-cutting measure. *See Misek v. City of Chicago,* 783 F.2d 98, 100–01 (7th Cir.1986); *Ryman v. Reichert,* 604 F.Supp. 467, 468–72 (S.D.Ohio 1985); *Mermelstein v. Haner,* 436 F.Supp. 238, 241 (W.D.Va. 1977), *aff'd,* 588 F.2d 1350 (4th Cir.1978); *Graham v. Haner,* 432 F.Supp. 1083, 1086 (W.D.Va.1976); *Chestnut v. Lodge,* 34 Ill.2d 567, 216 N.E.2d 799, 801–02 (Ill.1966); *Fitzsimmons v. O'Neill,* 214 Ill. 494, 73 N.E. 797 (1905); *Ball v. Board of Trustees of State Colleges,* 251 Md. 685, 248 A.2d 650, 654 (1968); *Newark v. Civil Service Commission,* 112 N.J.L. 571, 172 A. 589, 591 (1934), *aff'd,* 114 N.J.L. 185 176 A. 164 (N.J.1935); *Prosecutor's Detectives & Investigators Association of Essex County v. Hudson County Board of Chosen Freeholders,* 130 N.J.Super 30, 324 A.2d 897, 903 (Ct.App.Div.1974); *Wipfler v. Klebes,* 284 N.Y. 248, 30 N.E.2d 581, 584–86 (1940); *People ex rel. Corrigan v. Mayor,* 149 N.Y. 215, 224–25 43 N.E. 554 (1896); *Phillips v. Mayor,* 88 N.Y. 245, 246–47 (1882); *Weston v. Ferguson,* 8 Ohio St.3d 52, 457 N.E.2d 818, 819–20 (1983); *Kusza v. Maximonis,* 363 Pa. 479, 70 A.2d 329, 330–31 (1950). So long as the sweep of the axe is truly job-directed and not person-directed,

that is, if abolition of the position is not a mere pretext for removing an employee from office, the government's actions may not be challenged under a "no dismissal except for cause" standard. *E.g., Newark,* 172 A. at 591; *Weston,* 457 N.E.2d at 819–20.

In each and all of the analogous cases, the (dis) affected employee was protected from discharge by a legally enforceable rule similar to § 904, *e.g., Chestnut,* 216 N.E.2d at 801–02; *Phillips,* 88 N.Y. at 246–47; *Kusza,* 70 A.2d at 330, or by other civil service or merit schemes having precisely the same functional effect. *See, e.g., Ball,* 248 A.2d at 651–52; *Newark,* 172 A. at 591; *Weston,* 457 N.E.2d at 819–20. Nevertheless, courts have consistently rejected attempts to use such statutes, ordinances, and regulations to scotch government's discretionary power to reorganize or to trim its employment rolls. These cases recognize that, in respect to employment decisions of the administrative type, wide discretion is essential to the effective implementation of important government policies. A "no dismissal except for cause" rule is a shield to armor public employees against unwarranted personal attacks or unfair discrimination by their superiors; it is not a monkey wrench casually to be thrust into the machinery of government in order to frustrate legitimate change.

In *Chestnut,* for example, the Illinois Supreme Court denied the benefices of a statute comparable to § 904 to a group of employees who had been laid off for lack of work. (The law at issue in *Chestnut* provided "hearings for employees who have been removed, discharged, demoted or suspended for cause." 216 N.E.2d at 801.) The court had no trouble in limiting the Illinois statute in much the same manner that § 904 of the Charter must be restricted:

It is manifest that [the statute] affords plaintiffs no right to a hearing for there have been no discharges or disciplinary action for cause and that section deals only with relief from such administrative action.

*Id. See also Kusza,* 70 A.2d at 331 (rejecting contention that statute reaches employees furloughed for economic reasons); *Fitzsimmons,* 73 N.E. at 800 (the right to be heard upon dismissal for cause "does not apply to a case where the incumbent is dismissed for want of funds, or in order to reduce expenses").

Similarly, the New York Court of Appeals, in construing a provision designed to prevent removal except for cause, observed that:

> the statute does not apply to a case like this where the officer is removed, not to make way for another, but because his services are no longer needed, or because there are no funds provided for his payment. The plain purpose of the statute does not reach such a case.

*Phillips,* 88 N.Y. at 246.

Indeed, the primary protection which must be afforded to an employee who is dismissed for cause, an opportunity to be heard and to respond to the charges, would be meaningless in an authentic position-elimination case. As the Pennsylvania Supreme Court pointed out, "[i]n such cases, since there are no charges against the employee ... involved, there would be no occasion for a hearing, and it would be idle to hold one." *Kusza,* 70 A.2d at 331. *See also Kenny v. Kane,* 27 Misc. 680, 59 N.Y.S. (1899) ("To give an employee an opportunity to make an explanation when there is nothing to explain would be an idle ceremony."), *aff'd,* 52 A.D. 385, 65 N.Y.S. 204 (N.Y.App.Div.1900). A federal district court, confronted by a township's decision to eliminate a position in the albedo of a state "no dismissal except for cause" statute, lately phrased the same sentiments in a slightly different manner: "there is no need for Plaintiff to have an opportunity to present evidence on her job performance since that evidence would not be relevant to the Defendants' decision to abolish her job." *Ryman,* 604 F.Supp. at 471. The cogency of these observations is difficult to overlook.

Other factors illuminated by the caselaw also argue forcefully for the conclusion that § 904 of the Charter did not guaranty Hartman a hearing in the circumstances at bar. Nothing contained in the Charter or in Rhode Island law insures tenure for municipal employees generally, or affords them any right to continue in government service even if their particular positions are eliminated. The New York Court of Appeals has noted, in remarks which are fully pertinent to Providence's present-day legal landscape, that although "for cause" provisions are designed to shield the public workforce to some extent, "it was clearly not their intent to give to occupants of such positions a life tenure where upon grounds of economy or for other proper reasons the office or position is in good faith abolished." *People ex rel. Corrigan,* 149 N.Y. at 225. Federal Courts, too, have found this distinction to be dispositive. As was held in *Graham,* 432 F.Supp. at 1086 (footnotes and citations omitted):

> Had plaintiff been removed from a continuing position, plaintiff would undoubtedly have been entitled to a review of the termination.... However, the elimination of a position presents an entirely different situation. Indeed, the distinction between the two sets of circumstances must prove dispositive of plaintiff's claim of procedural inadequacies in the instant controversy. Clearly, a governmental unit may alter the structure of its administration.:... [T]he court is unaware of any authority supportive of the proposition that a duly authorized city reorganization can be violative of Constitutional due process safeguards.

To be sure, the dimensions of constitutionally sacrosanct property interests are defined in the initial instance by state law, "rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709. In this sense, what is crucial is how the Rhode Island courts would view § 904 of the Charter—not necessarily how similar provisions have been treated elsewhere.

The state courts have not yet had occasion authoritatively to parse § 904 of the Charter. The parties have not brought the

court's attention to any controlling state precedent involving a similar "no dismissal except for cause" rule. Thus, the question is arguably open as to whether Rhode Island, like so many sister jurisdictions, recognizes a "reorganization" or "furlough" exception to such a rule.

Hartman's counsel follows the admonition of the bard ("Once more unto the breach, dear friends, once more; ...." W. Shakespeare, *King Henry the Fifth*, act III, sc. i (1600)), and argues that Rhode Island caselaw extends the largesse of the Charter to one in the plaintiff's straitened circumstances. But, the Rhode Island cases cited by the plaintiff, fairly read, cannot carry the weight which she assigns to them. Most of these collected authorities concern employees who were dismissed following charges of misfeasance or nonfeasance; put another way, they envision person-directed firings. *See Riccio v. Town Council of Bristol*, 109 R.I. 431, 286 A.2d 881, 884 (1972) (plaintiff dismissed by town council after specific charges levelled at him); *Narragansett Racing Association v. Kiernan*, 59 R.I. 79, 82, 194 A. 49 (1937) (worker cashiered after reports that he had threatened another employee); *Hanna v. Board of Aldermen of Pawtucket*, 54 R.I. 392, 393, 173 A. 358 (1934) (police officer fired upon being found guilty of acts of misconduct); *McCarthy v. Board of Aldermen of Central Falls*, 38 R.I. 385, 387, 95 A. 921 (1915) (policeman removed from duty for wilful and negligent conduct). Rhode Island caselaw involving suspensions without pay echoes exactly the same note. *E.g., Whyte v. Sullivan*, 119 R.I. 649, 382 A.2d 186, 186–88 (1978) (senior clerk relieved of duties without pay for failure to display "truth and honesty" to department head); *Morgan v. Thomas*, 98 R.I. 204, 200 A.2d 696, 697–99 (1964) (police officers suspended on grounds of insubordination and conduct detrimental to the service); *Garvin v. McCarthy*, 39 R.I. 365, 366–67, 97 A. 881 (1916) (police officer suspended upon citizen complaint). The courts have handled demotions in a similar fashion. *E.g., Carroll v. Goldstein*, 100 R.I. 550, 217 A.2d 676, 680–82 (1966) (police sergeant demoted to patrolman for "ne-

glect of duty and conduct tending to cast disrepute on the department"). *Gartsu v. Coleman*, 82 R.I. 103, 106 A.2d 248, 249–51 (1954) (police captain dropped in rank as "punishment for misconduct").

Another variation on this theme was sounded in *Auge v. Anderson*, 112 R.I. 296, 309 A.2d 17, 19 (1973) and *Leduc v. Germain*, 66 R.I. 440, 19 A.2d 862, 863–64 (1941), where employees were discharged because they did not possess the statutory qualifications required for their jobs. In the two remaining Rhode Island cases upon which Hartman relies, workers were replaced for reasons not fully explained by the state supreme court—but neither opinion suggests, directly or by fair implication, that the discharges arose out of a bona fide reorganization or position elimination. *See Mellor v. Leidman*, 100 R.I. 80, 211 A.2d 633, 636 (1965); *Davis v. Cousineau*, 97 R.I. 85, 196 A.2d 153, 155 (1963). In none of these reported Rhode Island cases was a job abolished or the workforce reorganized.

This line of authority undoubtedly establishes that an employee who may only be dismissed for cause is entitled, under Rhode Island law, to extensive procedural protections. (Indeed, once the state has defined the parameters of the public servant's property interest, federal constitutional safeguards would certainly attach.). Yet, this caselaw wholly fails to provide any sustenance for the proposition that a hearing and other procedural protections must accompany the abolition of an employee's job. These decisions, one and all, involved person-directed rather than position-directed personnel actions.

Hartman's cause is likewise not furthered by Judge Boyle's decision in *Providence Teachers Union v. Donilon*, 492 F.Supp. 709 (D.R.I.1980). *Donilon* involved tenured teachers who, by state law, viz., the Teacher Tenure Act, R.I.Gen.Laws §§ 16–13–1—16–13–8, were considered to be "in continuing service." *Id.* at § 16–13–3. In such instances, state law ordains that teacher contracts are continuous unless a teacher is notified in writing to the contrary by a set date, well in advance. *Id.*

at § 16–13–2. And, if such a notice of nonrenewal is sent for whatever cause, the recipient is entitled to a statement of the reasons and to a hearing. *Id.* at §§ 16–13–2, 16–13–4. (The Providence Charter, of course, contains no similar panoply of protections for "regular employees.") *Donilon,* in this distinctive fact/law environment, dealt not with the interpretation of a "no dismissal except for cause" rule vis-a-vis nontenured public employees, but with the adequacy of the notice and hearing to be afforded to nonrenewed teachers. 492 F.Supp. at 711–13. It is well off the present point.[18]

The case of *Bergeron v. Batchelor,* 46 R.I. 224, 124 A. 291 (1924), although not cited by any party, bathes the point at issue in a more incandescent light. In *Bergeron,* the board of police commissioners of the city of Woonsocket promoted a half-dozen policemen. These elevations followed the pensioning of two ranking officers on disability grounds and a mini-reorganization of the department consequent to the disability retirements. Later, the pensioned officers protested; they were found not to be physically incapacitated and hence not subject to disability retirement. Without notice or an opportunity for anyone to be heard, the board reinstated the two pensioners, annulled the reorganization, and downgraded the six officers who had been promoted the month before, returning each to his former rank. Woonsocket at the time was subject to a city-specific state law, P.L.1900, ch. 775, which provided in pertinent part that Woonsocket policemen were not "subject to removal from office at any time, except for misconduct or incapacity," and that "all such removals shall be ... upon charges in writing

and of which the officer complained of shall have had notice and opportunity to be heard thereon." 46 R.I. at 226–27, 124 A. 291. And, in the rules adopted by the board of police commissioners, Rule Nine, so-called, reconfirmed these rights. *Id.* at 227, 124 A. 291.

Three of the six demoted officers sued, decrying the absence of notice and hearing. The state supreme court noted, first, that the petitioners "were not demoted for any fault or lack of efficiency," *id.* at 228, 124 A. 291, and that the board "acted in good faith with the purpose of promoting the economical and efficient administration of the Police Department." *Id.* The court then carefully distinguished *Garvin v. McCarthy, supra,* one of the person-directed suspension cases upon which Hartman relies. *Bergeron,* 46 R.I. at 229, 124 A. 291. The court concluded:

> To the Board of Police Commissioners the legislature has confided the duty and the power to provide for and to maintain protection of life and property in the city of Woonsocket. Having given great and comprehensive authority to the board for these vital public purposes, it is not reasonable to suppose that such authority was intended to be restricted without good reasons and a clear expression of such intention. The protection of the public by an efficient police force is the paramount object of the act. Secondary thereto is the intention to protect members of the police force from arbitrary action by the board; not to create a life tenure of office, but to prevent the demoralization of the force by frequent and unfair changes. We do not think it was the intention of the legislature to allow

---

18. To be sure, the notices of nonrenewal at issue in *Donilon* did use the naked phrase "program reorganization," and the district court held the generalization to be unsuited to its intended purpose in that case. *Donilon,* 492 F.Supp. at 713. But, plaintiff's attempt to read *Donilon* as a broadbrush condemnation of the reorganization/furlough exception in respect to "no dismissal except for cause" rules is the merest of velleities. The *Donilon* court held the unadorned and unexplained phrase to have been an inadequate specification of the reasons for teacher contract nonrenewal under R.I.Gen.

Laws § 16–13–4—nothing more. That issue is not before this court. (In fact, *see ante* at 1400, 1407, this court has found that Hartman received an ample statement of the reasons underlying elimination of the position.) The issue of *entitlement* to a hearing was not before the *Donilon* court: all parties conceded one was due; the question was as to the *sufficiency* of the hearing held. 492 F.Supp. at 710–11. The existence vel non of a reorganization or furlough exception to a conventional "no dismissal except for cause" rubric was not presented in *Donilon* in any way, shape or form.

an indefinite expansion, and to prohibit any decrease of the police force under any conditions. The effect of the act in our opinion is to forbid demotions, removals or other punishment for misconduct or incapacity except upon charges made, notice and trial. But the power of the board, acting in good faith to make changes in the police force necessary for the protection and welfare of the community is not so restricted. Changes, however, can not be made as a pretext or device to accomplish some other end than the one alleged.

\* \* \* \* \* \*

Upon consideration of the entire act, we think it was the intention of the legislature thereby to forbid the arbitrary demotion or removal of a police officer without proper reason but not to withhold from the board the power to make changes necessary for efficient administration.

*Id.* at 229–30, 124 A. 291.

*Bergeron,* though not squarely on all fours, is a relatively plain indication of Rhode Island's receptivity to the distinction which so many other courts have drawn between person-directed personnel actions (which under a "no dismissal except for cause" rule implicate a nontenured employee's property rights) and position-directed personnel actions (which under such a rule may be implemented without notice or a hearing).[19]

The impact of the *Bergeron* decision is magnified by a close reading of *Gartsu v. Coleman, supra. Gartsu* was a person-directed demotion case, which hinged in the first instance on case-specific questions of statutory interpretation. Yet the court, after holding that Captain Gartsu's demotion was a punishment for alleged misconduct which triggered an entitlement on his part to a specification of charges, notice, and a hearing, added the following (portentous) comments:

If it appeared that the board had actually exercised its "power to make

changes necessary for efficient administration" in the police department, or to make "changes in the police force necessary for the protection and welfare of the community," as stated in the *Bergeron* case, the question before us would have been different.

*Gartsu,* 106 A.2d at 251 (dicta).

*Gartsu* is important, too, for its recognition that municipalities act in varying capacities in respect to personnel matters. *Id.* at 249–50 ("the board at times acts in an administrative capacity and at times in a quasi-judicial capacity"). The most logical reading of *Gartsu* is consistent with the view that an agency, when streamlining itself in the interests of efficiency or economy (that is, when its considerations are position-directed), is acting administratively and does not run afoul of the property interests of nontenured employees. It is only when the agency's actions are focused on the qualifications, behavior, or performance of individual workers (that is, when its considerations are person-directed) that the rights inherent in a "no dismissal except for cause" rule are catalyzed.

Faced with Rhode Island authority which is suggestive but admittedly not so clear as to be entirely dispositive, "it is this court's task to vaticinate what the decision of the Rhode Island Supreme Court would be were that court faced with the issue" of the proper construction of § 904 of the Charter. *Plummer v. Abbott Laboratories,* 568 F.Supp. 920, 921–22 (D.R.I.1983). In addition to the best available state court precedent, sister state adjudications of the same (or similar) issue are probative in such circumstances. *Murphy v. Erwin-Wasey, Inc.,* 460 F.2d 661, 663 (1st Cir. 1972); *McInnis v. Harley-Davidson Motor Company, Inc.,* 625 F.Supp. 943, 950 (D.R. I.1986); *Plummer,* 568 F.Supp. at 922. In making such a judgment, "a federal court may reasonably assume that [the state supreme court] will follow the rule that appears best to effectuate the policies that

---

**19.** To be sure, *Bergeron* is of the somewhat hoary vintage. But, it remains good law. It has never been overruled, and has been cited ap-

provingly in several more recent Rhode Island cases. *E.g., Carroll v. Goldstein,* 217 A.2d at 681; *Morgan v. Thomas,* 200 A.2d at 697–98.

underlie the rule." *Bowen v. United States,* 570 F.2d 1311, 1322 (7th Cir.1978). *See also McInnis,* 625 F.Supp. at 956 n. 7.

In this instance, the reported Rhode Island cases suggest reading a reorganization or furlough exception into a "no dismissal except for cause" rule vis-a-vis nontenured public employees. The better-reasoned cases from other jurisdictions uniformly support the same result. Such an exception plainly promotes, in the Seventh Circuit's phrase, "the policies that underlie the rule." *Bowen,* 570 F.2d at 1322. And, common sense counsels that such an exception must exist. Indeed, any other construction of § 904 would paralyze the ability of municipal officials to govern and administer the City.

These signposts are unmistakable—but there is more. The indicated interpretation of § 904 of the Charter is bulwarked by the applicable canons of construction crafted over time by the state supreme court. Ordinarily, the plain and obvious meaning of the language of a statute controls. *Formisano v. Blue Cross of Rhode Island,* 478 A.2d 167, 168–69 (R.I.1984); *State v. Healy,* 410 A.2d 432, 410 A.2d 432, 434 (1980). *See also Blue Cross of Rhode Island v. Cannon,* 589 F.Supp. 1483, 1491 (D.R.I. 1984). As indicated above, if the word "dismissed" is given its "plain and obvious meaning," then it requires interposition of the reorganization exception.

Of course, "[t]o merit literal application, the language of the statute must not only be 'clear and unambiguous,' but it must convey 'a definite and sensible meaning that does not contradict an evident legislative purpose.'" *Id.* (quoting *Rathbun v. Leesona Corp.,* 460 A.2d 931, 933 (R.I. 1983)). Construction of § 904 of the Charter as person-directed rather than position-directed passes this test as well. The "evident legislative purpose" of the Charter provision—to safeguard regular employees of the City against arbitrary and capricious discharges—is fully preserved by the reorganization exception. And, inasmuch as the Rhode Island courts have consistently demonstrated an abhorrence toward construing laws in a fashion that "lead[s] to absurd or unreasonable results," *Tremblay*

*v. City of Central Falls,* 480 A.2d 1359, 1363 (R.I.1984); *see also Rhode Island State Police v. Madison,* 508 A.2d 678, 682–83 (R.I.1986), the reorganization exception becomes almost obligatory. In its absence, the predictable results would be chaotic. Providence would be hamstrung in its efforts to streamline municipal government or to adjust to changing times.

The Charter provision, construed in the manner urged by the plaintiff, would clearly impede "the right of a governing body to discontinue old methods, create new offices, and otherwise make changes in the public interest." *Newark,* 172 A. at 591. What is more, the "hearing" to which Hartman belatedly claims an entitlement would be at best an utter waste of time, at worst a complete fiasco. There would be no bill of particulars or specification of charges to be answered; rather, the dialogue would center around what revenues were available to government and how the City should best deploy them. Unless the trumpet is sounded with far more clarity than is here the case, courts ought not to march gratuitously into such a political thicket. Refusing to recognize a reorganization exception to § 904 would bring about, in the *Tremblay* phrase, "absurd or unreasonable results." 480 A.2d at 1363. This court will not buy such tawdry goods.

■ The court concludes that Rhode Island, if and to the extent that it has not already done so, will adopt the reorganization/furlough exception to the "no dismissal except for cause" rule in respect to nontenured public employees, and that § 904 of the Charter must be interpreted in this light. The reasons in support of such a finding are compelling. What the state supreme court said of Rhode Island's civil service mosaic for the protection of state employees can equally well be said of the Charter: the enactors "did not intend ... to restrict the authority ... to consolidate and combine duties in order to secure the development of an efficient public service for the public benefit." *Prete v. Parshley,* 99 R.I. 172, 206 A.2d 521, 523 (1965). The *Graham* court put it more colorfully:

It would be a most remarkable development in the law if a duly elected city governing body, acting on the advice of its chief administrator, could not effect changes in its city administrative structure without running afoul of procedural due process limitations. Yet, in essence, it is exactly such an aberration that plaintiff would pursue in this court.

*Graham*, 432 F.Supp. at 1089.

This court's holding that § 904 of the Charter applies only to person-directed losses of employment and not to those trailing in the wake of position-directed administrative reforms thus delimits the nature and scope of Hartman's property interest in the executive assistant job. She possessed such an interest only in terms of a personal attribute type of discharge; as § 904 by its plain language portends, she could not be dismissed for reasons related to her conduct, performance, qualifications, character, or the like without "cause," that is to say, without specification of charges, appropriate notice, and an opportunity to be heard at a meaningful time.[20] With regard to position-directed actions, however, such as reorganizations or furloughs growing out of government's perceived need to conserve funds, she enjoyed no comparable property interest in her employment; she had only an abstract desire to retain the job and a unilateral expectation of keeping it in the face of enforced budget cuts. And, as the Court has taught, one-sided assumptions of this sort, not rooted in "existing rules or understandings that stem from an independent source such as state law," *Roth*, 408 U.S. at 577, 92 S.Ct. at 2709, are manifestly insufficient to rise to the level of constitutionally protected property interests.[21]

There is, of course, one lingering question. Concededly, the plaintiff was entitled to a hearing if the Board's actions of March 22, 1984 were directed at her rather than at her position. Though there is a reorganization exception to § 904 of the Charter, the courts cannot permit the exception to become a convenient ruse whereby a government agency, simply by affixing a label, can avoid the necessity for demonstrating "cause" when it wishes to dismiss a particular employee. If the rule of law is to prevail, constitutional and statutory warrantees cannot so easily be skirted.

The Seventh Circuit has recently devised a careful prophylaxis for this potential malady. In *Misek v. City of Chicago*, 783 F.2d 98 (7th Cir.1986), the plaintiffs, municipal workers, complained that their discharge without a hearing violated due process. The defendants contended that the plaintiffs were cut loose because the agencies in which they toiled had been refashioned. The district court dismissed the complaint for failure to state claims upon which relief could be granted, predicating its judgment upon the reorganization exception. (Absent a reorganization, the plaintiffs would have possessed a property interest in their jobs and would have been entitled to notice and a hearing. *Misek*, 783 F.2d at 100.)

The Seventh Circuit reversed, holding that brevis disposition of the case was improvident without taking evidence as to the plaintiffs' assertion that the reorganization was a sham: "it was erroneous ... to *assume* that the plaintiffs were discharged in a reorganization," *id.* at 100 (emphasis added), merely because the defendants alleged as much. The court noted that the *Misek* plaintiffs, like Hartman, alleged "that the reorganization was a sham and that their jobs were never abolished." *Id.* at 101.

---

**20.** This case does not present any question as to the timing of the hearing in respect to a person-directed dismissal. *See, e.g., Loudermill,* 105 S.Ct. at 1494–95; *Brasslett,* 761 F.2d at 836–37. Accordingly, this court expresses no opinion thereon.

**21.** A somewhat different rule applies to cases involving the stigmatization of public employees, whether or not tenured. *Paul v. Davis,* 424 U.S. 693, 701–12, 96 S.Ct. 1155, 1160–66, 47 L.Ed.2d 405 (1976); *Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971). That special doctrine is inapposite to Hartman's quest to perennialize her position, however, as there is no evidence in this record that her reputation was blackened in any way incident to her separation from the City's service.

The court of appeals in *Misek* remanded for further proceedings below. Chief Judge Cummings, writing for a unanimous panel, limned the district court's task on remand in the following terms:

> [A]bsent good cause, [the plaintiffs] were improperly dismissed unless on remand it should be determined that their discharge was pursuant to an actual reorganization of the agency ...
>
> The complaint was improperly dismissed because it does not appear beyond doubt that plaintiffs could prove no set of facts in support of their claim which would entitle them to relief. Of course, if defendants on remand could show that plaintiffs were discharged pursuant to a reorganization in fact, plaintiffs would not be entitled to relief.

*Id.* (citations omitted).

The Misek court's formulation appears to be an eminently appropriate one. By permitting the district court to examine into the bona fides of the claimed realignment, the doctrine forestalls any devious attempt by "government officials to cry 'reorganization' in order to circumvent the constitutional and statutory protections guaranteed [public] employees." *Id.* On the other hand, the *Misek* rule likewise interdicts the holding of elaborate, unnecessary, expensive, and inherently futile administrative hearings just because a furloughed employee elects to play the frondeur when his or her position is eliminated in the course of a legitimate redeployment of government personnel. This court embraces and endorses the Seventh Circuit's paradigm for judicial scrutiny of these cases.[22] In so doing, the court notes that respectable First Circuit precedent seems entirely in harmony with such result. *See, e.g., Drown v. Portsmouth School District*, 451 F.2d 1106, 1109 (1st Cir.1971) (court of appeals "recognize[s] that where a teacher makes a plausible claim that her collateral constitutional rights have been violated,

she is entitled to a hearing in federal court despite the existence of another and otherwise nonarbitrary reason"). And, although this approach addresses a paradigmatic question of federal rather than state law, it is interesting to observe that *Bergeron*, 46 R.I. at 300, 124 A. 291, can be read harmoniously with it.

In view of what has been stated before, *see ante* Part II(A), application of the *Misek* rubric to the case at bar speedily writes finis to Hartman's procedural due process claim. Here, the factfinding process has run its full course, and the court need not "assume" anything: there is ample proof that the reorganization of the Superintendent's office was no sham. The relevant findings of fact have been set out, *see ante* Parts I, II(A), and it would serve no useful purpose to repastinate that ground. It suffices to say that, under the oversight of the Board, Cook was struggling manfully to bring spending into control, to utilize available resources more efficaciously, and to meet the Department's added responsibilities. As the Superintendent and the Board joined forces to fight the battle of the budget, there were casualties. One such loss was the demise of the executive assistant position. That fatality was clearly part and parcel of a bona fide restructuring of the Department, undertaken in good faith and in a genuine endeavor to conserve scarce municipal funds. It was in no way a pretext sculpted to exile the plaintiff from the public payroll. The Board's actions (and Cook's as well) were directed at the position, not at the person. As *Ryman* teaches:

> [A]n appointing authority may abolish a position with the concomitant result that an employee loses her job, subject to the one important limitation that the appointing authority may not abolish a position as a mere subterfuge to rid itself of a particular employee.

**22.** The *Misek* formulation is, at bottom, no different from that which was applied sub silentio in *Ryman, supra.* There, Judge Rice noted that "[t]he critical guideline in the abolishment of a civil service position is that it must be done in good faith and not as a subterfuge." 604

*F.Supp.* at 469 (citations omitted). Finding that the plaintiff's position was eliminated as a legitimate economy measure, the *Ryman* court rejected her due process claim to a predeprivation hearing. *Id.* at 469–70.

*Ryman,* 604 F.Supp. at 468. *See also Garvey v. City of Lowell,* 85 N.E. 182 (Mass. 1908).

Accordingly, the reorganization exception applies here in full flower. The eradication of the executive assistant post was unfeigned: it was an authentic economy measure which the Superintendent and the Board conceived as one of a series of such measures designed administratively to alleviate the parlous financial condition of the Department. That being so, a hearing would have been an idle exercise—and Hartman was not entitled to one. The plaintiff has failed to prove any abridgement of procedural due process anent her loss of municipal employment.

## C. *Substantive Due Process*

The plaintiff has also raised a substantive due process claim. Essentially, such a contention addresses the alleged "arbitrary and capricious" nature of the defendants' actions. *E.g., Ventetuolo,* 470 F.Supp. at 891.

■ Passing the question of whether Hartman must demonstrate a legal entitlement to continued tenure (that is, a constitutionally protected property or liberty interest) to catalyze this substantive due process right, *see Perkins,* 686 F.2d at 51 n. 5 ("plaintiff's [substantive due process] claim would fail on our determination that she had no constitutionally protected property right"); *Willens v. University of Massachusetts,* 570 F.2d 403, 406 (1st Cir.1978) ("We ... do not reach the question of whether a claim to substantive due process can stand in the absence of a finding of a constitutionally protected property or liberty interest."), it is abundantly clear that she has shown no violation here. Although arbitrariness may take divers forms,

*Drown,* 451 F.2d at 1108, none of them flourish in this arrid terrain.

The decision to discard the executive assistant position was sufficiently founded on existing, articulated facts to pass constitutional muster of this type. It is past cavil that the Department's budgetary concerns were real, acute, and substantial. For almost a year, the Board had been interviewing senior staffers and trying to find ways to curb expenditures. There was a growing concern that Diamond had created a topheavy bureaucracy: the commissioners suspected that, given the need for emphasis on grounds maintenance, there were too many chiefs and too few Indians. From and after his investiture in October 1983, Cook shared these interests. Seen against this extensive backdrop, and having in mind the Superintendent's veridical conclusion that the executive assistant position had become excess baggage, there was ample "evidence" before the Board on March 22, 1984 rationally to sustain its decision to eliminate the post.

## III.

For these reasons, the plaintiff can take nothing in this suit.[23] She was not fired in retaliation for the exercise of her first amendment rights, nor was her job abolished as a ruse by the defendants to rid themselves and the City of her presence. Hartman received whatever process she was due; although no administrative hearing was held, she never requested such an opportunity—and, in any event, she had no entitlement to one. She possessed no property interest in her position sufficient to freeze her in place or to safeguard her against the slings and arrows of a legitimate departmental reorganization. The Board's decision to trim the departmental roster in the interest of economy by, inter

---

**23.** Disposition of the case on these grounds makes it unnecessary for the court to consider a variety of other defenses which have been raised. By failing to address those contentions, however, the court does not mean to imply that they lack merit. To cite but one example, the individual defendants, in their respective personal capacities, seem entitled to exoneration on the claims for money damages by reason of the doctrine of qualified immunity. (That doctrine is, of course, of no assistance to the defense vis-a-vis the "official capacity" claims for equitable relief, i.e., reinstatement and backpay.) Whatever else may be said of Cook and the Board, the law was not "clearly established" against their actions at the times in question. *E.g., Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).

alia, doing away with the executive assistant slot was exactly what the defendants have claimed it to be; it was not merely a handy way to assure Hartman's eloignment. On this record, the decision was neither arbitrary nor capricious.

What has happened here is that the Parks Department, having come belatedly to grips with the lean realities of municipal finance, began to reconsider the ambitious vision of its mission which Diamond had crafted in his halcyon days. Retrenchment was necessary—and retrenchment is always painful. The plaintiff, who had given unstingingly of her time and effort and whose dedication to the enhancement of Providence's park system cannot be doubted, was bitterly disappointed by the outcome. But, disappointment alone, no matter how honestly or deeply felt, cannot be bootstrapped into an entitlement which does not otherwise exist.

The business of local government is an increasingly difficult one in this modern age. Courts should not intrude gratuitously to make an operose task the more arduous by denying government the right, exercisable in good faith, to reorganize itself to confront the fiscal exigencies which from time to time arise. It matters little, for purposes of this case, whether the City and the Department are better or worse off with or without an executive assistant to the Superintendent. What matters most is that the municipality, within the parameters set by civil service and by collective bargaining, has the power and the discretion to manage its own destiny, so long as it acts rationally, honestly, and with due regard to applicable constitutional and statutory imperatives. Cities, like people, must be free to make their own mistakes.

The clerk is directed forthwith to enter judgment for the defendants for costs.[24]

---

**24.** Judgment should also enter at this time for the plaintiff, as counterdefendant, on the counterclaims of the defendant DeSimone. *See* text *ante* at 1396.