Vincent R. DUFFY, et al.,
Plaintiffs, Appellants,

v.

Brian J. SARAULT, etc., et al.,
Defendants, Appellees.

No. 89–1099.

United States Court of Appeals,
First Circuit.

Heard Sept. 7, 1989.

Decided Dec. 19, 1989.

Thomas J. Liguori, Jr., with whom Urso, Liguori and Urso, Westerly, R.I., was on brief, for plaintiffs, appellants.

Thomas J. McAndrew, Providence, R.I., for defendants, appellees.

Before BOWNES, Circuit Judge, and ALDRICH and GIBSON,* Senior Circuit Judges.

FLOYD R. GIBSON, Senior Circuit Judge.

Appellants are two former classified employees of the City of Pawtucket, Rhode Island, whose positions were eliminated in a reorganization of city government in 1988. They argued at trial, and here on appeal, that the reorganization was a sham designed to oust them because of their political affiliation with the preceding mayor who was an adversary of the current Mayor of Pawtucket, an appellee. Appellants' claims are based under 42 U.S.C. § 1983 and § 1985, the First Amendment, the due process clause of the Fourteenth Amendment, and Rhode Island state law. Their complaint named the current Mayor, certain members of his administration, and the Personnel Board of the City. After a bench trial, the district court entered judgment for the defendants on all counts. We now affirm.

## BACKGROUND

The appellants, Vincent Duffy and Paul Breault, were political supporters of former Pawtucket Mayor Henry Kinch who served in that job from 1981 until 1987. Breault had been an advisor of Kinch's since 1969 and worked as a strategist in Kinch's mayoral campaigns. Kinch named Breault City Clerk in 1982, and Breault later became Director of the Department of Parks and Recreation, a classified post. Breault served there until his termination in June, 1988. Duffy was not politically active in recent years, but was formerly a campaign chair and treasurer for Mayor Kinch. At the time of his termination, Duffy was the Assistant Director of Public Works and had been for some two and one-half years.

The Director of Public Works, after January 1988, was Eugene Jeffers, an appointee of the current Mayor, appellee Brian Sarault. Jeffers was the appellants' supervisor and delivered their notices of termination due to reorganization on June 14, 1988. Jeffers' boss, Mayor Sarault, had been an alderman during the Kinch administration and was a vocal opponent of Mayor Kinch. In 1985 Sarault unsuccessfully ran against Kinch in the Mayor's race. During his next term Mayor Kinch announced he would not contend in the following election. Thus, the door was open for Sarault who ran for, and won, the Mayor's seat.

There is no question that the Kinch and Sarault camps were at odds with one another. The record does not reflect what precisely were the sore points. It suffices to say, as the district court did, that the relationship of the parties was marked by considerable acrimony. The question which remains is whether that led to the appellants' unlawful termination under the Constitution or state law. The district court answered in the negative on all of the claims after hearing close evidence that supported both parties' cases, but which ultimately, according to the district court, weighed greater for the defendants-appellees. Because our decision is based on a careful review of the evidence, we fully set out the facts, quoting at length from the district court's opinion where pertinent.[1]

---

* The Honorable Floyd R. Gibson, of the Eighth Circuit, sitting by designation.

1. *Duffy v. Sarault,* 702 F.Supp. 387 (D.R.I.1988).

## FACTS

The positions held by Breault and Duffy and eliminated by reorganization were, respectively, Director of Parks and Recreation and Assistant Director of Public Works.

Prior to the reorganization, the Department of Parks and Recreation contained two subdivisions, one having to do with recreational activities and the other having to do with maintenance of the City's parks and recreational facilities. There was a person in charge of each of these activities who reported to Mr. Breault. The reorganization eliminated the Director's position, but split the department into two sections, headed by a Superintendent of Parks and a Superintendent of Recreation. The result was that the same work was divided among the two superintendents and, indeed, after the reorganization the same work was performed by the same persons. Mr. Breault applied for several vacant positions, including the Superintendent of Recreation, Superintendent of Parks, [Supervisor] of Public Works Operations, and Assessor. He received no interview with respect to the Superintendent of Recreation's position; he had interviews with respect to the other positions but was not offered a slot. [Mr. Jeffers testified he chose a higher scoring candidate for the position of Superintendent of Parks]. Mr. Breault, as a Director, was at pay grade 15 for which he received $37,100 per year. The Superintendent of Park's position paid something more than $29,000 per year.

· · · · ·

The requirements for the newly created position of Supervisor of Public Works Operations, which proximated the job responsibilities of Mr. Duffy's position as Assistant Director of Public Works, included a ten year experience requirement. Because Mr. Duffy did not have ten years experience he was not eligible for that position.

*Duffy*, 702 F.Supp. at 389.

We elaborate on the controversy surrounding Duffy's job and his replacement. Duffy held a college degree in his job as assistant director, but, because the reorganized position of supervisor required only a high school diploma and ten years experience and because Mr. Duffy did not have the requisite ten years, he could not even apply for the job even though it paralleled his work as assistant director. In addition, appellants' brief suggests, and testimony supports the conclusion, that an ally of Jeffers' and Sarault's, Louis Simon, moved into Duffy's office and began to assume Duffy's tasks prior to the reorganization. In the end, it was Simon who got the job of Supervisor of Public Works Operations, a title which he apparently was given prior to the reorganization.

The reorganization plan went through several stages. First, a Management Task Force studied the City's operations [at the behest of Mayor Sarault who apparently did not at all follow their progress]. The committee was a volunteer effort of nine public spirited citizens, the majority of whom were selected by Mr. Baptista, the chairman of that advisory committee. His selections were made with assistance from the Blackstone Valley Chamber of Commerce. Mr. Baptista testified that the Task Force had five meetings before June 9, 1988, that the Department of Public Works [appellants' department] was the subject of a lengthy discussion of one hour and a half on May 5, 1988, and that he met on May 5, 1988 with Mr. Jeffers, the Sarault administration's Director of the Department of Public Works. He relied on Mr. Jeffers and other people on the Management Task Force who had more experience. The Task Force prepared a preliminary report which suggested that certain positions be abolished, including the Assistant Director of Public Works [Duffy's job].

The reorganization was voted on June 13, 1988 by the Personnel Board of the City. There is no record of a consideration of reorganization by the Personnel Board from January 6, 1988 until the action taken on June 13, 1988. The Board is composed of five members, who

are appointed by the Mayor with the approval of the City Council. Two members were appointed by Mayor Sarault, two by former Mayor Kinch, and one by former Mayor Lynch. The Personnel Board was unanimous in adopting the reorganization which became effective July 1, 1988.

After the reorganization's adoption fourteen people were notified of their termination. However, of the fourteen, two persons retired and only four others are no longer City employees, including the three persons who were Plaintiffs in this case [The third plaintiff is not a party to this appeal. He dropped out after finding other work with the aid of Mayor Sarault] and a part-time nurse who worked in the community medical services unit. The reorganization resulted in a savings of $123,000.

*Duffy,* 702 F.Supp. at 389–90.

The record does not reveal how much of a savings was had with respect to the jobs of Breault and Duffy alone, but it appears to have been none. Nevertheless the overhaul in the Department of Public Works was otherwise substantial. The department had 189 employees and the reorganization plan recommended abolishing thirteen positions and establishing seven others. The Director of Public Works, Jeffers, testified that the changes were long overdue and had nothing to do with the Kinch affiliations of Breault and Duffy.

The district court, however, did find that the political affiliations of the two "were substantial factors in the Defendants' decision to reorganize the Department of Public Works." *Duffy,* 702 F.Supp. at 391. We will come back to this finding in our discussion of the First Amendment infra.

Other relevant testimony credited by the district court was that of Robert Litchfield, who had dropped out of the case, and Councilman Doyle of Pawtucket.

Robert Litchfield, the former City Property Manager who had been a Plaintiff in this action, testified that Sarault's Administrative Assistant expressed surprise at Litchfield's surprise about the reorganization, stating "this happens to everybody in our business."

. . . . .

Councilman Doyle, a Kinch supporter, testified that he was president of the City Council from 1981 to 1987 during the Kinch administration. He had a discussion with Mr. Jeffers on election evening at an establishment called "Hooligan's" on Central Avenue in Pawtucket at which time Mr. Jeffers said something to the effect that things are going to be different "once we get rid of the Byners and the Breaults." Byner was then City Solicitor.

*Id.* at 390.

Appellants argue that the evidence as a whole demonstrates that they were fired for political reasons and the district court erred by denying their claims. We consider each one of their claims.

## FIRST AMENDMENT

### Scope of Review

The gist of both parties' briefs and the better part of this case concerns the First Amendment claims of Duffy and Breault. The claims are substantial and the evidence close. The district court found, in fact, that the political affiliations of Duffy and Breault were impermissibly considered in the decision to reorganize the City of Pawtucket which eliminated their jobs. Nevertheless, the court went on to find that the two would have lost their jobs anyway, regardless of their political ties, and thus that no First Amendment violation occurred. *Duffy,* 702 F.Supp. at 391. The appellants contend error in this finding by the district court and urge us to reverse by substituting our judgment for that of the district court, by authority of *Bose Corp. v. Consumers Union of the United States, Inc.,* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). Appellees conversely suggest we are bound by the clearly erroneous standard in our review of the district court's findings.

Because the evidence is close, the standard of review we employ will be dispositive of this claim. For this reason we have

devoted considerable attention to the question with an extended discussion of our decision to use the clearly erroneous standard.

As the district court discussed in its opinion, the correct analysis of this political dismissal claim is provided in *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). A plaintiff must show the speech he engaged in was constitutionally protected and a substantial factor in his termination in order to show a violation of the First Amendment. The defendant then has an opportunity to rebut and prove by a preponderance that the plaintiff would have been terminated regardless of his protected speech. *Id.* at 287, 97 S.Ct. at 576.

Whether by judge or jury, these latter determinations are findings of fact. They are difficult facts to find, too. As the district court noted: "[d]irect evidence of retaliatory firings is rare; facts in these cases must often be inferred from the evidence." *Duffy,* 702 F.Supp. at 391. Such inferences are harder still to make, and not wisely made, by an appellate court. It would seem to go without saying that the standard of review would be whether such findings when made from the bench were clearly erroneous. Fed.R.Civ.P. 52(a).

However, the first *Mt. Healthy* finding (whether the speech was protected) implicates the First Amendment. The appellants put forth a well-made argument that the Supreme Court has declared that review of all First Amendment questions like this one must be plenary to adequately safeguard the inviolable rights we hold so dear under that Amendment. Appellants rely on *Bose Corp. v. Consumers Union of the United States, Inc.,* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) in which the Court stated:

> in cases raising First Amendment issues we have repeatedly held that an appellate court has an obligation to "make an independent examination of the whole record" in order to make sure that "the judgment does not constitute a forbidden intrusion on the field of free expression." *New York Times v. Sullivan,* 376 U.S.
> [254] at 284–86 [84 S.Ct. 710 at 728–29, 11 L.Ed.2d 686 (1964)]. [citations omitted]

*Bose,* 466 U.S. at 499, 104 S.Ct. at 1958.

Thus, the precise question we are attempting to answer is whether *Bose* requires a de novo review of a finding that a defendant has shown by a preponderance that termination (here reorganization) would have occurred regardless of the plaintiff's protected conduct under *Mt. Healthy,* or whether the more conventional, clearly erroneous standard applies. This question has not been precisely answered in this circuit. On point, there are five cases that mention *Bose* and deal with varying facets of this issue. Of those, two cases were not presented with this precise issue. *In re The Bible Speaks,* 869 F.2d 628, 630 (1st Cir.), *cert. denied,* — U.S. ——, 110 S.Ct. 67, 107 L.Ed.2d 34 (1989); *Collazo Rivera v. Torres Gaztambide,* 812 F.2d 258, 259 (1st Cir.1987). The third and most recent case mentioning *Bose* is a defamation case and the issue of de novo review was not involved. *Kassel v. Gannett Co.,* 875 F.2d 935, 937 (1st Cir.1989).

The other two cases do deal with aspects of our questions. *Brasslett v. Cota,* 761 F.2d 827 (1st Cir.1985), involved a fire chief who made certain statements in the local press for which he was fired. The district court concluded that the chief's statements were not protected speech. This court reversed, finding the statements were protected speech on de novo review of the evidence. With respect to *Bose,* we said:

> We believe that *Bose* clearly requires us to undertake an independent review of the district court's ultimate finding that Brasslett's statements to the press were unprotected under the First Amendment. [citations omitted] Like the determination of actual malice, the balancing test prescribed in *Pickering* [*v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)] exemplifies an inextricable relationship between the evolution of constitutional law and the case-by-case application of specific facts to existing legal rules. We must therefore examine, under the appropriately height-

ened standard, the correctness of the trial judges' findings of fact regarding the pertinent interests to be weighed—the nature of the plaintiff's speech and the impact of that speech on the defendants' ability to perform their public responsibilities.

*Id.* at 840.

*Brasslett* acknowledges the principles of *Bose* "that an appellate court reviewing First Amendment cases is not bound by the clearly erroneous standard set forth in Fed. R.Civ.P. 52(a)," and referred to "the rule of independent appellate review historically applied in First Amendment cases." *Id.* at 839. [citations omitted.]

The opinion goes on to review the evidence on the defendant's preponderance burden under *Mt. Healthy* and finds that the defendants failed to meet that burden. *Id.* at 846–47. Because we were not reviewing a finding of the district court under the latter part of *Mt. Healthy* as we must in the instant case, *Brasslett* fails to yield an answer to our question.[2]

Finally, in *Figueroa v. Aponte–Roque,* 864 F.2d 947 (1st Cir.1989), the plaintiffs claimed they were not renewed in their jobs with the Department of Education of Puerto Rico because of their political affiliations. The plaintiffs lost after a jury trial and on appeal argued that *Bose* allowed a stricter review of the evidence. Without saying anything more, in a footnote we said:

> We reject appellants' suggestion that we review the facts in political discharge cases de novo, as in cases involving free speech. *See Bose Corp. v. Consumers Union of the United States, Inc.,* 466 U.S. 485, 498–511, 104 S.Ct. 1949, 1958–64, 80 L.Ed.2d 502 (1984); *Brasslett v. Cota,* 761 F.2d 827, 839–40 (1st Cir.1985). We previously have adhered in political discharge cases to the traditional standard of review, and we see no reason to depart from that practice at this time.

*Id.* at 949 n. 3, [citation omitted].

While the facts of this case make it seem like *Figueroa,* a political discharge case,

the posture of the case is more like *Brasslett,* because it involves review of a district court's *Mt. Healthy* determinations. Thus, *Figueroa* is not dispositive, and because of the similarities to *Brasslett,* we expound more at length upon why we answer our precise question with the clearly erroneous standard.

Again our launching point is *Bose.* In the language quoted from *Bose,* read as the appellants would like, the Court seems to suggest that appellate courts may review de novo all cases involving free expression. However, appellants fail to note one of the most salient features of the language: it was made in the context of a defamation case like *New York Times v. Sullivan.* On the same page the appellants quote, the Court in *Bose* explained:

> Our standard of review must be faithful to both Rule 52(a) and the rule of independent review applied in *New York Times Co. v. Sullivan.* The conflict between the two rules is in some respects more apparent than real. The *New York Times* rule emphasizes the need for an appellate court to make an independent examination of the entire record; Rule 52(a) never forbids such an examination, and indeed our seminal decision on the Rule expressly contemplated a review of the entire record, stating that a "finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court *on the entire evidence* is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co., supra,* [333 U.S. 364] at 395 [68 S.Ct. 525 at 541, 92 L.Ed. 746 (1948)] (emphasis supplied).

*Bose,* 466 U.S. at 499, 104 S.Ct. at 1959.

Further on this point, the Court made it clear that heightened independent appellate review applies to the determination of actual malice in defamation cases because of the particular constitutional values the

---

**2.** Certainly *Brasslett* stands for the proposition that, if in question, we would review de novo the district court's determination that Duffy and

Breault's political affiliations were protected speech, but that is not what is complained of in this appeal.

*New York Times* rule protects. *Id.* at 501–02, 104 S.Ct. at 1959–60.

Later cites to *Bose* by the Court support this view. In a case addressing the review of the voluntariness of a confession, the Court cited *Bose* for the proposition that de novo review is important to appellate courts as expositors of law "[w]here, for example, as with proof of actual malice in First Amendment libel cases, the relevant legal principle can be given meaning only through its application to the particular circumstances of a case...." *Miller v. Fenton,* 474 U.S. 104, 114, 106 S.Ct. 445, 451, 88 L.Ed.2d 405 (1985). In a case upholding the constitutionality of a Maine statute under the commerce clause, the Court, citing *Bose,* said "no broader review [of factual findings] is authorized here simply because this is a constitutional case, or because the factual findings at issue may determine the outcome of this case." *Maine v. Taylor,* 477 U.S. 131, 145, 106 S.Ct. 2440, 2451, 91 L.Ed.2d 110 (1986) [citations omitted]. In *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), the Court rejected an argument, similar to appellants' here, that *Bose* was authority for de novo review of a finding of vote dilution. The Court pointed out that *Bose* involved determination of actual malice in a defamation case and did not apply in the instant case. *Id.* at 78, 106 S.Ct. at 2780. In *Rankin v. McPherson,* 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987), the Court cited *Bose* to support de novo review of determinations of what is protected speech, as a question of law. *Id.* at 386 n. 9, 107 S.Ct. at 2897 n. 9.

The Ninth Circuit has said that the *Bose* decision as well as the case law of that circuit required de novo review of the *O'Brien* [3] factors in a case where a city ordinance regulated free speech. *Playtime Theaters, Inc. v. City of Renton,* 748 F.2d 527, 535 (9th Cir.1984), *rev'd,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). We note that in the reversal of that case before the Supreme Court, the Court expressly declined to review the Ninth Circuit's reading of *Bose* as unnecessary to a decision in that case. *Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 53 n. 3, 106 S.Ct. 925, 932 n. 3, 89 L.Ed.2d 29 (1986).

*Brasslett* applied de novo review to a fact situation other than actual malice, but it did so on the similar question of what is protected free speech. *Brasslett,* 761 F.2d at 840. Thus, *Brasslett* is not authority for the proposition that all findings of fact are subject to de novo review in a First Amendment case. The concern in *Brasslett,* as in *Bose,* is for those findings that "exemplif[y] an inextricable relationship between the evolution of [First Amendment] constitutional law and the case-by-case application of specific facts to existing legal rules." *Id.* De novo review of such findings ensures that the federal courts remain zealous protectors of First Amendment rights.

■ Thus, findings on what is protected free speech (the first part of *Mt. Healthy*) are appropriately considered by de novo review. The findings on whether that speech substantially affected a defendant's employment decision and whether the defendant has met his preponderance burden that the decision would be made anyway (the other two parts of *Mt. Healthy*), however, are not considered by de novo review, but are factual determinations subject to the clearly erroneous standard. *See Wren v. Spurlock,* 798 F.2d 1313, 1317 (10th Cir. 1986), *cert. denied,* 479 U.S. 1085, 107 S.Ct. 1287, 94 L.Ed.2d 145 (1987). These latter findings do not directly touch First Amendment rights. Rather, they are findings about a defendant's subjective employment decisions made from documentary and testimonial evidence, both of which are best judged by a trier of fact, particularly where credibility determinations will be made. Fed.R.Civ.P. 52(a); *see Anderson v. Bessemer City,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). We hold that the standard of review of the finding on a defendant's preponderance burden from *Mt. Healthy* is whether the

---

3. *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (stating a four-part test to determine the constitutionality of regulations that restrict free speech).

finding was clearly erroneous under Rule 52(a).

### Application of Rule 52(a)

■ Appellants "won" the first two parts of *Mt. Healthy* and appeal only the district court's conclusion that the appellees proved by a preponderance that they would have reorganized despite the appellants' affiliations with Kinch. We do not find that conclusion to be clearly erroneous.[4] The district court was in a far better position to view the evidence at trial than we are from the flat record. Having reviewed the entire record we are not "left with a definite and firm conviction that a mistake has been committed." *See United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). With that in mind, we address some of the evidentiary points raised by the appellants.

Appellants argue that the district court's findings are contradictory and thereby clearly erroneous. The two findings disputed are that, on the one hand, political affiliation played an impermissible part in the decision to reorganize and that, on the other, the reorganization would have been made anyway. Appellants point to several things: 1) that no precise savings were shown to be had by eliminating their positions; 2) that Duffy was replaced even before the reorganization, and the job performed by his replacement was roughly equivalent to his old job of assistant director; 3) that the same work was performed in Breault's division after reorganization with some title changes. All of this evidence suggests political affiliation was impermissibly considered in the decision to reorganize, and the district court made that finding. This evidence, however, does not necessarily bear on the question of whether appellees could show reorganization would have occurred anyway. That evidence is of a broader nature, taking the reorganization as a whole. The district court rightly considered the particular impact on appellants to determine if political affiliation played a substantial factor in their terminations and then considered the reorganization as a whole to determine if it would have proceeded anyway. The district court's findings are not inconsistent.

The appellants go on to attack the evidence relied on by the district court on the question of whether the reorganization would have occurred anyway. For example, where the district court relied on the recommendation of the Baptista Task Force, the appellants argue that the district court ignored Baptista's alliance with Mayor Sarault. It is unlikely that the district court ignored anything; it had all the evidence before it. But, because evidence is presented by opposite views, the court must credit certain evidence over other evidence. The district court credited Mr. Baptista's testimony, despite evidence of his political affiliation with Sarault. In essence, that is a credibility decision that we cannot say was clearly erroneous.

Much of the appellants' argument is with the district court's view of the evidence, like the argument above about Baptista. That is, they quarrel with the court's decision to credit certain testimony and other evidence. The appellants, of course, would reach a different result. That, however, is not a sign that the district court erred.

Along a similar line, the appellants suggest that the district court abandoned its own expressed views in reaching its findings. For example, appellants complain that the district court could in one breath note that the end result of the reorganization suspiciously left only Duffy and Breault without jobs, yet, in the next, find that the reorganization would have occurred anyway. This, again, is largely a dispute with how the court credited certain evidence.

Examined in isolation, any one of the points the appellants argue makes a good case of political discrimination that denies a finding that the reorganization would have gone forward. But evidence is never isolated. It must be considered vis-a-vis other, oftentimes, contradictory evidence. In the end the evidence must be summed up

---

**4.** We express no opinion on what view of the evidence we would have under de novo review.

to reach a finding of fact, crediting some parts of it over others. This is what the district court did, only to the dissatisfaction of Duffy and Breault.

We note that even if we were sitting as triers of fact who would have viewed the evidence differently from the district court (or even as the appellants urge, in some instances), that would not make the district court's decision clearly erroneous. *See Anderson*, 470 U.S. at 573–74, 105 S.Ct. at 1511. Under that standard, although the evidence is close, we find the district court's view of the evidence plausible from our review of the entire record.

## DUE PROCESS

■ Appellants argue that they were denied procedural due process when their jobs were eliminated by reorganization and that the district court erred by concluding otherwise. The district court first determined that the plaintiffs had a property interest in their jobs as classified employees of Pawtucket. The court recognized, however, that that interest was not in perpetuity and did not exist after the jobs were eliminated. This has been called the "reorganization exception" to due process hearings. *See Misek v. City of Chicago*, 783 F.2d 98, 100–01 (7th Cir.1986). Where a reorganization or other cost-cutting measure results in dismissal of an employee no hearing is due. *See Hartman v. City of Providence*, 636 F.Supp. 1395, 1410 (D.R.I. 1986) (collecting cases).

■ The appellants do not deny this rule, but instead argue that the district court misapplied it, by failing to determine if the reorganization was pretextual. They quote at length from *Ryman v. Reichert*, 604 F.Supp. 467 (S.D.Ohio 1985), to suggest that the district court failed to properly determine if the reorganization was pretextual. Without reaching an opinion on the standard from *Ryman*, we find that because the district court determined that the

reorganization was valid for purposes of *Mt. Healthy*, another finding on that point under due process was unnecessary. The district court found, and we have affirmed, that the appellees proved that they would have reorganized despite the political affiliations of appellants.

■ In short, that was a finding that the reorganization was not pretextual. Either the reorganization was a sham or it was not.[5] The district court found it was not, and did not repeat itself under its due process analysis, but properly went straight to a consideration of what was left after a valid reorganization. We find that because the appellants' jobs were lost subject to a valid reorganization they were not entitled to due process prior to that reorganization taking effect.[6]

## STATE CLAIMS

■ The district court properly exercised its pendent jurisdiction and resolved two state law claims based on the same facts of reorganization as considered under the constitutional claims. The district court's conclusions on state law are due considerable deference on appeal. *Gary Braswell & Assocs. v. Piedmont Indus.*, 773 F.2d 987, 989 n. 3 (8th Cir.1985). "[W]e are reluctant to interfere with a reasonable construction of state law made by a district judge, sitting in the state, who is familiar with that state's law and practices." *Rose v. Nashua Bd. of Educ.*, 679 F.2d 279, 281 (1st Cir.1982) (citations omitted). We believe the district court's decision not to grant relief under the Rhode Island Open Meetings Law, R.I.Gen.Laws § 42–46–8 (1987 reenactment), was reasonable for the considerations given in its opinion. *Duffy*, 702 F.Supp. at 394 (giving reasons).

As to the City Charter provisions, we agree with the district court that a plain reading of sections 7–104(19) and 7–101 do not admit of any violations where positions

---

**5.** If the organization were found to be pretextual under due process, it would logically have been impossible earlier to find that defendants had met their preponderance burden from *Mt. Healthy*.

**6.** Accordingly, we do not have to reach the district court's view of the City of Pawtucket Personnel Rules and Regulations, Rule III, Section 7, under due process.

have been abolished or eliminated due to a valid reorganization. *Id.* at 393.

 Finally, there are Rule XVI, Section 1 and Rule III, Section 7 of the City of Pawtucket Personnel Rules and Regulations. Rule XVI, Section 1 prohibits discrimination for political affiliation "in any way" against classified employees. The district court declined to answer the question of whether the appellants were discriminated against "in any way" under that section. The court found, instead, that under Rule III, Section 7, the appellants had failed to exhaust their administrative remedies. *Duffy,* 702 F.Supp. at 392 n. 3.

The appellants complain that Rule III, Section 7 does not require any administrative appeal, and thus the district court erred. In pertinent part, Section 7 reads, "[a]ny officer, employee, or citizen, who feels himself aggrieved ... *may* appear before the Board...." City of Pawtucket, Personnel Rules and Regulations, Rule III, Section 7 (emphasis added).

As the appellants suggest, the use of the word "may" does not require an appeal to the personnel board. But it does grant one as a matter of right. There is some authority in Rhode Island for the proposition that administrative remedies must be pursued prior to the invocation of a judicial forum. *See Chase v. Mousseau,* 448 A.2d 1221, 1224 (R.I.1982). *But see Lefebvre v. Kando,* 119 R.I. 780, 383 A.2d 589 (1978) (a Pawtucket case allowing resort to state court without discussion of administrative remedies). Yet it is not clear what Rhode Island state courts would require under the Personnel Rules and Regulations of Pawtucket. Nevertheless, it was not error for the federal district court, in its discretion, to decline review where state administrative rights had not been exercised by the appellants.[7]

## OTHER CLAIMS

We agree with the district court that appellants' § 1985 claims have no merit

because no constitutional violation was found. Similarly, we find the appellants' claims for nominal damages and for attorneys' fees to be without merit.

The judgment of the district court is

Affirmed.

---

**7.** This is not like 42 U.S.C. § 1983 where exhaustion of remedies is not required before making a constitutional claim. *See Patsy v. Florida Board of Regents,* 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982). The personnel rules are the basis of a state claim which the district court has discretion to decline to consider.