Pat GODIN, Plaintiff,

v.

## MACHIASPORT SCHOOL DEPARTMENT BOARD OF DIRECTORS, Defendant.

Civil No. 1:09–cv–00077–NT.

United States District Court, D. Maine.

Feb. 17, 2012.

Catherine L. Haynes, Sandra Hylander Collier, Ellsworth, ME, for Plaintiff.

Melissa A. Hewey, Drummond Woodsum, Portland, ME, for Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

NANCY TORRESEN, District Judge.

### FINDINGS OF FACT

### MS. GODIN'S TERM AS PRINCIPAL OF THE FORT O'BRIEN SCHOOL

1. Plaintiff Pat Godin has a solid background in education. Ms. Godin has a Bachelor of Science degree in health, physical education and recreation; a master's degree in educational leadership; and she is "all but dissertation" in a doctoral program in educational leadership from the University of Maine. Ms. Godin has worked as a physical education teacher for four years and has served as a principal for over eight years.

2. Ms. Godin is certified to be a superintendent, principal, curriculum coordinator, health and physical education teacher, and gifted and talented teacher.

3. On August 28, 2006, Ms. Godin entered a one-year contract with the Machiasport School Department Board of Directors ("**the Board**") to serve as a half-time principal at the Fort O'Brien School ("**the School**"), which is a K–8 school in School Union 134 located in Machiasport in Washington County.

4. Ms. Godin reported directly to Dr. May Bouchard, the Superintendent for School Union 134, who in turn answered to the Board. The Board and Dr. Bouchard thought that Ms.

Godin's strong administrative background would allow her to exert more control over the staff, implement a formal evaluation process and make necessary changes at the School.

5. From the beginning, there was tension between Ms. Godin and her staff, who were unaccustomed to the type of supervision provided by Ms. Godin. While the School's prior principal had observed teachers in their classrooms, Ms. Godin entered classrooms more frequently, sometimes without notice. Some of the teachers and staff felt intimidated and did not appreciate Ms. Godin's formal evaluation process. Evaluations were thorough, and Ms. Godin pulled no punches.

6. Some of the School parents were also put off by Ms. Godin's changes at the school, including tightened security and a less welcoming atmosphere.

7. Dr. Bouchard and the Board remained firmly supportive of Ms. Godin's efforts. On May 1, 2007, the Board (at that time composed of Mary Hinerman, Julie Hixson and Sandra Prescott) voted unanimously to adjust Ms. Godin's status to full time. The minutes of the May 1, 2007 School Board meeting state, "Principal Godin went over and above what was asked of her. She has done a commendable job...." In recognition of her efforts, the Board offered her a two-year contract as a ¾ time principal and a ¼ time G/T teacher, adjusted her salary to full-time and gave her a COLA increase.

8. Shortly after the Board issued Ms. Godin's second contract, some of the staff contacted Dr. Bouchard to complain about Ms. Godin's handling of a student, which they described as abusive. Dr. Bouchard went to the School the next day to investigate and witnessed Ms. Godin using legitimate Mandt procedures. Ms. Godin physically restrained a disruptive child and removed him from the classroom to prevent him from harming himself or others. Dr. Bouchard described Ms. Godin's use of the Mandt techniques as correct and appropriate. Dr. Bouchard realized that the staff could have mistaken these procedures for abuse.

9. Dr. Bouchard brought in a facilitator to improve relations between Ms. Godin and the School staff. The facilitator concluded, however, that the staff and Ms. Godin were not compatible. Dr. Bouchard, who testified that the teachers "balked" at Ms. Godin's attempt to change things, did not fault Ms. Godin for the breakdown in relations.

10. In June of 2007, the composition of the Board changed. Rose Williams was elected and made Chair of the Board, and Sandra Prescott was defeated. Christy Rolfe was appointed to a one-year position on the Board to replace Julie Hixson, who resigned on June 5, 2007.

11. In September of 2007, former Board member Sandra Prescott overheard homophobic statements about Ms. Godin made by School staff and a town official. Ms. Prescott wrote a "citizen's complaint" to the Board requesting an investigation into these statements. The only Board member questioned about this letter at trial was Rose Williams. Ms. Williams testified that she had never seen the letter and was unaware of Ms. Prescott's

allegations. The Board meeting minutes for September, 2007 reflect that the Board went into executive session to discuss a citizen complaint. The minutes also reflect that Rose Williams was absent from that meeting.

12. Although it is unclear whether the other Board members were aware of Ms. Prescott's concerns, it is clear that Dr. Bouchard and the newly composed Board remained fully supportive of Ms. Godin.

## NEGOTIATING A NEW PRINCIPAL CONTRACT DESPITE ANTICIPATED LOSS OF STATE SUBSIDY

13. In January of 2008, Dr. Bouchard learned that the School might lose as much as $300,000 in state subsidies. Dr. Bouchard assured the Board that the decrease would not actually happen and everything would be fine. The Board trusted Dr. Bouchard and was aware that significant budget decreases had been preliminarily reported in the past but had been reversed each time.

14. At the March 4, 2008 Board meeting, Dr. Bouchard recommended that the Board offer Ms. Godin a new, three-year contract. Dr. Bouchard was pleased with Ms. Godin's performance, and she knew that if the state subsidy did decrease, the contract's reduction in force (RIF) provision would allow the Board to terminate the contract for a "change in local conditions."

15. The Board went into executive session for only thirteen minutes to negotiate Ms. Godin's new three year contract for a ¾ principal position and a ¼ gifted and talented teacher position. Under Ms. Go-

din's 2008–2011 contract, her annual pay was raised to $44,148, plus her gifted and talented salary of $9,694, plus a maintenance stipend for a total annual salary of $58,842.

16. Around the time her contract was renewed, Ms. Godin asked the Board whether they wanted her to lighten up at the School. The Board responded that Ms. Godin should stay the course.

17. Shortly after Ms. Godin's contract was renewed, Dr. Bouchard asked Ms. Godin to develop a model for implementing a RIF of excess teachers. Ms. Godin developed a matrix to be applied to teacher RIFs. Ms. Godin recommended RIFing two teachers. At that time, there was no suggestion that Ms. Godin might lose her own position.

## THE SCHOOL BUDGET PROCESS

18. By law, the State of Maine funds up to 55% of essential programs and services (EPS) for public schools provided that local communities contribute their "share" of their schools' operating costs. The EPS formula determines how much money is needed to operate the essential programs and services at a "model" school.

19. As part of the EPS calculation, the number of teachers, educational technicians, guidance counselors, and school administrators needed to provide essential programs and services is determined. Under the EPS formula, the state considers one principal for 305 students and one teacher for 17 students to be appropriate for a K–8 school. These ratios are then used to de-

termine necessary staffing levels for a school of any given size.

20. Like many rural Maine towns, Machiasport has experienced a decrease in student enrollment over the last several years. In small K–8 schools, it is impossible to meet the EPS ratios without combining grades and using parttime principals. Local communities are required to pay the extra costs—above and beyond the local share calculated by the EPS formula—for any higher staffing levels. In 2008–2009, Machiasport met its local contribution to trigger the state subsidy and then went on to make an additional local contribution of $173,927 to fund items not covered by the EPS formula, such as additional teachers.

21. The EPS formula multiplies the town's property valuation by a state-wide mill rate to determine how much a local community must contribute to trigger the state subsidy. Machiasport, because of its coastal property, has a high property valuation.[1] However, the median family income in Washington County remains one of the lowest in the United States.

22. In 2007–2008, the School had 81 students, seven classroom teachers and Ms. Godin, who served as ¾-time principal and ¼-time gifted and talented teacher. The budgeted state subsidy for that school year was $602,644 and the local contribution under the EPS formula was $556,512. The town of Machiasport approved an additional lo-

cal contribution of $97,000 for a total local contribution of $653,512.

23. By October of 2008, the School's student enrollment had dropped to 41.[2] The number of classroom teachers was cut to 5, one of whom served as a teaching principal. The budgeted state subsidy for 2008–2009 dropped to $403,348.92, and the local contribution under the EPS formula increased to $593,430. The town of Machiasport approved an additional $173,927 in 2008–2009 for a total local expenditure of $767,357.

24. Since the 2008–2009 school year, the state subsidy has continued to drop precipitously. Although enrollment at the School has leveled off to between 50 and 60 students, the EPS subsidy for the 2011–2012 school year has fallen to $19,117.20 due to the climbing Machiasport property values. The number of classroom teachers now stands at four, and one of the teachers, who is responsible for grades 4 through 8, also receives a stipend to act as principal. When Dr. Bouchard's contract ended in 2009, she was not rehired. Superintendent Scott Porter who had been in charge of Local Union 102 added Local Union 134 to his duties, and he now serves as superintendent of schools for eleven towns.

## MOUNTING TENSION IN MACHIASPORT

25. In April of 2008, about 15 concerned Machiasport citizens held a meeting at the Machiasport Town

---

**1.** The Court takes judicial notice of the U.S. Census Bureau 2010 census data which puts Machiasport's population at 1,119.

**2.** Because of the lower enrollment, the EPS formula based the total operating cost calculations on a teaching staff of 3.4 full time teachers and .2 of a principal position.

Hall to discuss their concerns about Ms. Godin. Ms. Godin's secretary, Joleen Nicely, told the group at the meeting about two incidents where she had witnessed Ms. Godin being physically rough with two students. The group was outraged.

26. After the meeting at the Machiasport Town Hall, approximately 50–60 "guests," including staff and parents, attended the April 8, 2008 Board meeting to express their concerns about Ms. Godin's alleged physical abuse of the two students and her brusque demeanor with staff and parents.

27. After the Board meeting, Dr. Bouchard placed Ms. Godin on paid administrative leave pending an investigation by former superintendent Omar Norton.

28. Mr. Norton did not investigate the abuse allegations, however, because he believed that they should be investigated by the police. Instead, Mr. Norton focused on the complaints that Ms. Godin had created an intimidating atmosphere at the School. After his investigation, Mr. Norton reported to the Board that Ms. Godin and the staff were not working well together, and he recommended that Ms. Godin be removed.

29. After receiving the Norton report, the Board hired Jonathan Goodman, a former police officer and an attorney with the Machiasport School Department's law firm, to investigate the abuse allegations. Mr. Goodman's report concluded that the abuse allegations were unfounded.

### THE RIF

30. While the investigations were pending, the Board was struggling to come to grips with the School's 2008–2009 budget. By mid-April, the Machiasport Valley Observer was reporting that the actual loss of State subsidy was going to be around $180,000.

31. Students were transferring out of the School in large numbers. At the April 8, 2008 meeting, seven students were allowed to seek Superintendent transfers. At the May 6, 2008 meeting, five transfers were approved. At the May 14, 2008 meeting, two transfers were approved. At the June 4, 2008 meeting, four more transfers were sought and approved. Loss of students meant loss of revenue under the EPS formula.

32. The amounts identified by Ms. Godin's RIF matrix fell short of the cuts the Board needed to make. The Board and Dr. Bouchard were unwilling to go to the town selectman for an even bigger "additional local contribution" for 2008–2009. Board members and parents alike had concerns about further reducing the number of teachers, which would mean combining even more grades in single classrooms.

33. At the May 14, 2008 meeting, the Board unanimously voted to create a ¾-time teacher, ¼-time principal position. The Board also unanimously approved a RIF of two teachers, a ½-time special education teacher, and an itinerant specials teachers from 1–1/2 days to 1 day per week.

34. Dr. Bouchard called Ms. Godin, still on administrative leave, to tell her that the Board wanted a teaching principal and that her principal position was going to be eliminated as

part of the RIF. Dr. Bouchard asked Ms. Godin if she was interested in the position. Although she could not recall the details of the conversation, Dr. Bouchard wanted the teaching principal to teach 7th and 8th grade. Ms. Godin responded that she was not certified to teach.[3]

35. Ms. Godin was never offered an opportunity to contest her termination. There was no evidence offered to suggest that Ms. Godin ever requested a hearing.

36. On June 4, 2008, the Board unanimously passed a motion to RIF the "fulltime" principal position.

37. On June 6, 2008, Ms. Godin received a letter from Dr. Bouchard, informing her that the Board "has had to RIF the ¾ time principalship position due to significant subsidy loss." The letter went on to state that "after much deliberation, the committee has decided to have a teaching/principal position."

38. Beverly Taylor was hired by the Board on August 12, 2008 for the teacher/principal position. No teacher was hired in the capacity of gifted and talented teacher after Ms. Godin left.

39. Since her position was terminated, Ms. Godin has tried unsuccessfully to get teaching, principal and superintendent positions. She has submitted 90 applications to date.

## CONCLUSIONS OF LAW

### PROCEDURAL DUE PROCESS:
### 42 U.S.C. § 1983

40. To prevail on a claim of a violation of procedural due process under 42 U.S.C. § 1983, the plaintiff must show by a preponderance of the evidence "first that it has a property interest as defined by state law and, second, that the defendants, acting under color of state law, deprived it of that property interest without constitutionally adequate process." *SFW Arecibo, Ltd. v. Rodriguez*, 415 F.3d 135, 139 (1st Cir.2005) (quoting *PFZ Properties, Inc. v. Rodriguez*, 928 F.2d 28, 30 (1st Cir.1991)).

41. The Supreme Court has established that a plaintiff has a property interest in public employment when state law, rules, or understandings create a "legitimate claim of entitlement" to continued employment. *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 576, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) ("A written contract with an explicit tenure provision clearly is evidence of a formal understanding that supports a teacher's claim of entitlement to continued employment unless sufficient 'cause' is shown.").

42. The First Circuit recognizes a reorganization exception to due process that "eliminates the need for a hearing where a reorganization or other costcutting measure results in the dismissal of an employee." *Whalen v. Mass. Trial Court*, 397 F.3d 19, 24 (1st Cir.2005); *Duffy v. Sarault*, 892 F.2d 139, 147 (1st Cir.

---

**3.** Ms. Godin was certified to teach only health, physical education, and gifted and talented. Despite Ms. Godin's lack of teaching certification, Maine does permit teachers to start teaching without a certificate if they obtain their certification while teaching.

1989) ("Where a reorganization or other cost-cutting measure results in dismissal of an employee no hearing is due."). The reorganization exception applies "[w]hen the termination at issue is 'in good faith directed at positions rather than individuals,'" and performance factors do not play a role in the employee's termination, *Whalen*, 397 F.3d at 25–26 (quoting *Hartman v. City of Providence*, 636 F.Supp. 1395, 1409 (D.R.I.1986)). "[S]o long as the sweep of the axe is truly job-directed and not person-directed, that is, if abolition of the position is not a mere pretext for removing an employee from office, the government's actions may not be challenged under a 'no dismissal except for cause' standard." *Hartman*, 636 F.Supp. at 1410.[4]

43. The evidence at trial showed that the School suffered a significant subsidy loss in 2008. The Plaintiff failed to discredit or otherwise contradict the testimony of Dr. Bouchard and Board members Hinerman, Rolfe, and Williams that they were satisfied with the Plaintiff's performance and eliminated her position solely because of the decreased state subsidy.

44. The Board members' testimony that they supported the Plaintiff despite pressure from the teachers and community is supported by the documentary evidence. The Board renewed the Plaintiff's contract on two occasions, each time increasing her compensation. The Board's meeting minutes reflect that the Board was pleased with the Plaintiff's performance.

45. The Court concludes that the Board was unconcerned about the teachers' complaints about the Plaintiff precisely because the Board was trying to exert more control over the teachers. Even the Plaintiff conceded that the Board was fully supportive of her until July of 2008, well after the decision to RIF her position. Superintendent Bouchard credibly testified that she offered the new teaching position to the Plaintiff but that the Plaintiff turned down the offer because the Plaintiff lacked certification.

46. While the Plaintiff did produce evidence that members of the community wanted to have her investigated and terminated because of allegations that she abused stu-

---

**4.** Reading *Hartman, Duffy,* and *Whalen* together, it is not clear whether an employee terminated under the reorganization exception lacks a property interest and therefore has no entitlement to due process, or has a property interest but, because of the exception, is not entitled to due process. *Compare Hartman*, 636 F.Supp. at 1415 ("[w]ith regard to position-directed actions, such as reorganizations or furloughs growing out of government's perceived need to conserve funds, [the plaintiff] enjoyed no comparable property interest in her employment") *and Duffy*, 892 F.2d at 147 ("the [property] interest was not in perpetuity and did not exist after the jobs were eliminated") *with Whalen*, 397 F.3d at 24 ("we have recognized a limited 'reorganization exception' to due process that eliminates the need for a hearing where a reorganization or other cost-cutting measure results in the dismissal of an employee"). *See also West v. Grand County*, 967 F.2d 362, 366 (10th Cir.1992) (finding a property interest where employee could not be discharged "except for cause or reasons of curtailment of work or lack of funds"); *Goudeau v. Indep. Sch. Dist. No. 37*, 823 F.2d 1429, 1431–32 (10th Cir.1987) (property interest where termination only for "specified reasons, including a lack of work or funds"). In this case, either framing of the issue leads the Court to the same result.

dents and was harsh with staff and parents, the Plaintiff was unable to show that the staff and community animosity was shared by the Board. Dr. Bouchard was of the view that the allegations that Plaintiff had abused students were unfounded and likely the erroneous conclusion of someone untrained in dealing with students with behavioral problems. Dr. Bouchard was also clearly on the Plaintiff's side in her dispute with the teachers and staff. The Board members relied heavily on Dr. Bouchard for guidance. The Plaintiff has failed to prove that the Board considered the allegations of abuse or concerns with the Plaintiff's leadership style when the Board voted to eliminate the Plaintiff's position.

47. Likewise, the homophobic sentiments expressed by some staff and a town official were obviously not shared by the Board. After the "citizen's complaint" by Sandra Prescott was raised in September of 2007, the Board voted to give Ms. Godin a three-year contract.

48. The Defendant, on the other hand, presented a strong case that the RIF was genuine. Faced with a shortfall of approximately $180,000, aware that students were transferring out of the School, concerned about combining even more classrooms, and cognizant that the town's generosity had a limit, the Board faced hard fiscal realities. The Plaintiff pointed to additional funding streams that the Board could have tapped and offered scenarios that would have eliminated positions other than her own; however, the fact that the Board could have reorganized differently is beside the point. The Defendant had

the power and discretion to "manage its own destiny." *Hartman*, 636 F.Supp. at 1419.

49. On May 14, 2008, at the same meeting that the Board decided to create the teacher/principal position, the Board also eliminated two teachers and a ½-time special education teacher and reduced an itinerant teacher's hours. Far from being a pretextual RIF, the cuts were part of a good faith restructuring of the School. The elimination of Ms. Godin's position was a rational choice. Ms. Godin was not immediately qualified to take the teacher/principal position, and the record contains no evidence that Ms. Godin offered to become qualified for the position after being offered it by Dr. Bouchard.

50. Because the Plaintiff has not established by a preponderance of the evidence that the elimination of her position was anything other than the result of Defendant's good faith reorganization, the Plaintiff was not entitled to due process when the Defendant eliminated her position. Since the Plaintiff was not entitled to constitutionally adequate due process, the Plaintiff's § 1983 claim fails.

**BREACH OF CONTRACT**

51. To prevail on a breach of contract claim, the plaintiff must prove "(1) breach of a material contract term; (2) causation; and (3) damages." *Maine Energy Recovery Co. v. United Steel Structures*, 724 A.2d 1248, 1250 (Me.1999).

52. The Plaintiff's contract with the Defendant contained a provision reserving the right to the Board to

terminate the contract after 90 days notice "when budgetary limitations or other changes in local conditions warrant the elimination of the administrative position for which this contract was made." The contract also allowed the Board to terminate the contract upon discharge for cause after written notice of the discharge and opportunity for a hearing.

53. To maintain a cause of action for breach of the "change in local conditions" term of the contract, the plaintiff must show either that the defendant did not eliminate the plaintiff's administrative position, or that the defendant eliminated the plaintiff's position in bad faith. *Paradis v. Sch. Admin. Dist. No. 33 Sch. Bd.*, 446 A.2d 46, 50 (Me. 1982).

54. Half of a principal position (from ¾-time to ¼-time) was eliminated. Additionally, the ¼-time gifted and talented teaching position was eliminated. So at least three-fourths of the Plaintiff's position was eliminated. The fact that the newly created teaching principal position was actually offered to the Plaintiff also undermines any claim that she should have been entitled to keep the ¼-principal position that survived the RIF.

55. As discussed in the Conclusions of Law for the Plaintiff's § 1983 claim, *supra*, the Court concludes that the Defendant acted in good faith when it eliminated the Plaintiff's position.

56. There is no question that there was a change in local conditions after the Board voted to give the Plaintiff a three year contract in March of 2008. Although the Board and Dr. Bouchard were aware of the $300,000 possible shortfall during March of 2008, they did not seriously believe that it would occur. Reality seemed to hit sometime in mid-April. Additionally, the loss of students (and corresponding loss of funding) was occurring in April and May of 2008. Both of these factors establish a "change in local conditions" sufficient to trigger the RIF provision under the Plaintiff's contract.

57. Because the Plaintiff failed to prove by a preponderance of the evidence either that the Defendant did not eliminate her position or that the Defendant eliminated her position in bad faith, the Plaintiff failed to establish that the Defendant breached a material term of her contract with the Defendant.

58. Because the Court concludes that there was no breach of a material term of the contract between the parties, the Plaintiff's breach of contract cause of action fails.

SO ORDERED.